Lotes Co., Ltd. v. Hon Hai Precision Industry Co.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————————

August Term, 2013

(Argued: January 13, 2014                           Decided: June 4, 2014)

Docket No. 13-2280

————————————

LOTES CO., LTD.,

*Plaintiff-Appellant,*

—v.—

HON HAI PRECISION INDUSTRY CO., LTD, FOXCONN INTERNATIONAL HOLDINGS, LTD., FOXCONN ELECTRONICS, INC., FOXCONN INTERNATIONAL, INC., AKA FOXCOMM INTERNATIONAL, INC.,

*Defendants-Appellees,*

FOXCONN (KUNSHAN) COMPUTER CONNECTOR CO., LTD.,

*Defendant.*

————————————

Before:

KATZMANN, *Chief Judge*, LIVINGSTON, *Circuit Judge*, and CARTER, *District Judge*.[1]

_____

Appeal from a judgment entered on May 20, 2013, by the United States District Court for the Southern District of New York (Scheindlin, *J.*), dismissing the plaintiff's federal antitrust claims for lack of subject matter jurisdiction under the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a, and declining to exercise supplemental jurisdiction over the plaintiff's remaining state-law claims. We hold, under *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006), and its progeny, that the requirements of the FTAIA are nonjurisdictional, overruling *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922 (2d Cir. 1998), in this respect. However, we reject the plaintiff's contention that the defendants have waived these nonjurisdictional requirements by contract in this case. We further hold, following the Seventh Circuit's decision in *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) (en banc), that foreign anticompetitive conduct has a "direct . . . effect" on U.S. domestic or import commerce under the FTAIA, 15 U.S.C. § 6a(1), where there is a reasonably proximate causal nexus between the conduct and the effect. We decline to decide whether, under the proper standard, the plaintiff here has plausibly alleged a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic or import commerce under the FTAIA, *id.*, but affirm the district court's dismissal of the plaintiff's antitrust claims on the alternative ground that any such effect did not "give[] rise to" the plaintiff's claims. 15 U.S.C. § 6a(2).

Accordingly, the judgment of the district court is **AFFIRMED**.

_____

[1] The Honorable Andrew L. Carter, United States District Judge for the Southern District of New York, sitting by designation.

NICHOLAS S. GIKKAS, The Gikkas Law Firm, Palo Alto, CA (Douglas M. Garrou and Ryan A. Shores, Hunton & Williams LLP, Richmond, VA, and Washington, DC, *on the brief*), *for Plaintiff-Appellant Lotes Co., Ltd.*

WILLARD K. TOM (Thomas M. Peterson, Thomas J. Lang, and Brian A. Herman, *on the brief*), Morgan, Lewis & Bockius LLP, San Francisco, CA, Washington, DC, and New York, NY, *for Defendants-Appellees Hon Hai Precision Industry Co., Ltd., Foxconn International Holdings, Ltd., Foxconn Electronics, Inc., and Foxconn International, Inc., AKA Foxcomm International, Inc.*

JAMES FREDERICKS, U.S. Department of Justice (William J. Baer, Assistant Attorney General, and Kristen C. Limarzi, Attorney, U.S. Department of Justice; Jonathan E. Nuechterlein, General Counsel, John F. Daly, Deputy General Counsel for Litigation, and Mark S. Hegedus, Attorney, Federal Trade Commission, *on the brief*), Washington, DC, *for Amici Curiae the United States of America and the Federal Trade Commission*.

_____

KATZMANN, *Chief Judge*:

This appeal presents important questions regarding the extraterritorial reach of U.S. antitrust law. The plaintiff, a Taiwanese electronics manufacturing company with facilities in China, alleges that the defendants, a group of five competing electronics firms, have attempted to leverage their ownership of certain key patents to gain control of a new technological standard for USB connectors and, by extension, to gain monopoly power over the entire USB

3

connector industry. In considering whether these allegations suffice to state a viable claim under the Sherman Act, 15 U.S.C. §§ 1, 2, we must decide whether the restrictions Congress has imposed on antitrust claims based on foreign conduct under the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a, are jurisdictional in nature; whether the defendants in this case have waived the requirements of the FTAIA by contract; whether the defendants' alleged anticompetitive conduct has a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic or import commerce under the FTAIA, *id.* § 6a(1); and whether any such effect "gives rise to" the plaintiff's claims, *id.* § 6a(2).

We hold that, under the principles articulated in a line of recent Supreme Court decisions extending from *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006), to *Sebelius v. Auburn Regional Medical Center*, 133 S. Ct. 817 (2013), the requirements of the FTAIA are substantive and nonjurisdictional in nature. Because Congress has not "clearly state[d]," *id.* at 824 (quoting *Arbaugh*, 546 U.S. at 515), that these requirements are jurisdictional, they go to the merits of the claim rather than the adjudicative power of the court. In so holding, we overrule our prior decision in

4

*Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922 (2d Cir. 1998), in this respect. However, although the FTAIA's requirements are nonjurisdictional and thus potentially waivable, we reject the plaintiff's argument that the defendants somehow have waived them by contract in this case.

We further hold that foreign anticompetitive conduct can have a statutorily required "direct, substantial, and reasonably foreseeable effect" on U.S. domestic or import commerce even if the effect does not follow as an immediate consequence of the defendant's conduct, so long as there is a reasonably proximate causal nexus between the conduct and the effect. We thus reject the interpretation of "direct . . . effect" advanced by the Ninth Circuit in *United States v. LSL Biotechnologies*, 379 F.3d 672, 680 (9th Cir. 2004), which the district court followed below, in favor of the interpretation advocated by *amici curiae* the United States of America and the Federal Trade Commission ("FTC") and adopted by the Seventh Circuit in its en banc decision in *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 856–58 (7th Cir. 2012) (en banc).

We need not decide, however, whether the plaintiff here has plausibly alleged the requisite "direct, substantial, and reasonably foreseeable effect"

under the proper standard. That is because the FTAIA contains a second limitation, under which the aforementioned domestic effect must "give[] rise to" the plaintiff's claim. 15 U.S.C. § 6a(2). Here, regardless of what effect the defendants' conduct has on U.S. domestic or import commerce, any such effect did not "give[] rise to" the plaintiff's claim. To the contrary, in the causal chain the plaintiff alleges, the plaintiff's exclusion from the relevant market actually *precedes* the alleged domestic effect.

Accordingly, we affirm on alternative grounds the judgment of the district court dismissing the plaintiff's claims.

## BACKGROUND

*I.     Factual Background*

The pertinent facts, resolving all ambiguities and drawing all reasonable inferences in the plaintiff's favor, are as follows.

Plaintiff-Appellant Lotes Co., Ltd. ("Lotes") is a Taiwanese corporation specializing in the design and manufacture of electronic components for notebook computers, including Universal Serial Bus ("USB") connectors. USB connectors are used primarily to connect computer peripherals, such as printers,

6

keyboards, and external hard drives, to personal computers, smart phones, and other electronic devices. USB connectors are among the most successful connectors in the history of personal computing, having achieved near-universal adoption from device and peripheral makers.

Lotes manufactures USB connectors in factories located in China. From there, it typically sells the connectors to other Taiwanese firms with facilities in China known as Original Design Manufacturers ("ODMs"). ODMs make and assemble computer products incorporating USB connectors for many well-known computer brands, such as Acer, Dell, HP, and Apple. Those name-brand computer products, in turn, make their way into the hands of consumers and businesses around the world, including in the United States. "According to industry sources and press reports, as of 2011[,] roughly 94% of global notebook computers were assembled by a small number of Taiwanese vendors, primarily [ODMs] maintaining production facilities in China." J.A. 36.

The defendants are a group of companies that compete with Lotes in making and selling USB connectors. They also are involved in making, assembling, and distributing electronic components and devices that incorporate

USB connectors. Defendant-Appellee Hon Hai Precision Industry Co., Ltd. ("Hon Hai") is a Taiwanese corporation that is one of the world's largest manufacturers of electronic components, including USB connectors. Defendant-Appellee Foxconn International Holdings, Ltd. is a Cayman Islands corporation specializing in the design and manufacture of components for consumer electronics products, and is one of the largest exporters from China. Defendant-Appellee Foxconn International, Inc. is a California corporation that receives products from other Foxconn companies for distribution within the United States. Defendant-Appellee Foxconn Electronics, Inc. is another California corporation that designs and manufactures components for consumer electronics. Defendant Foxconn (Kunshan) Computer Connector Co., Ltd. ("Foxconn Kunshan") is a Chinese ODM.[2]  Although the corporate relationships among the defendants are not clear from the complaint, Lotes often refers to the Foxconn defendants collectively, and alleges that Hon Hai has "invested in Foxconn International [Holdings] to manufacture goods in China and other places." J.A. 41.

---

[2]  Lotes never effected service on Foxconn Kunshan under the Hague Convention, and Foxconn Kunshan has not entered an appearance, either below or on appeal.

The dispute in this case arises out of the development of the latest industry standard for USB connectors, known as USB 3.0. This standard represents a major technological advance over prior standards, including a significant increase in data transmission speeds. When Lotes filed its complaint in this case in late 2012, USB 3.0 connectors were expected to replace the previous generation of USB connectors entirely within a year's time.

Common technological standards like USB 3.0 carry pro-competitive benefits and anticompetitive risks. On the pro-competitive side, common standards enable different firms to produce products that are compatible with one another, promoting innovation and competition. Because standards-compliant products can interoperate with many other products, they can be more valuable, providing greater benefits to consumers and simulating increased investment from manufacturers. Standardized products also reduce the need for customization, which facilitates economies of scale and enables downstream manufacturers to switch suppliers more easily. These effects promote price competition and drive down costs.

At the same time, "[t]here is no doubt that the members of [standard-setting] associations often have economic incentives to restrain competition and that the product standards set by such associations have a serious potential for anticompetitive harm." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988). The process of developing standards, for example, requires extensive cooperation and coordination among competitors, which can be subverted to anticompetitive ends. *See id.* Technical standardization also creates "lock-in" effects and raises the specter of "patent hold-ups." The Third Circuit has described this kind of abusive scheme as follows:

> [A standard-setting organization] may complete its lengthy process of evaluating technologies and adopting a new standard, only to discover that certain technologies essential to implementing the standard are patented. When this occurs, the patent holder is in a position to "hold up" industry participants from implementing the standard. Industry participants who have invested significant resources developing products and technologies that conform to the standard will find it prohibitively expensive to abandon their investment and switch to another standard. They will have become "locked in" to the standard. In this unique position of bargaining power, the patent holder may be able to extract supracompetitive royalties from the industry participants.

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 300 (3d Cir. 2007).

10

To guard against these risks, standard-setting organizations restrain the behavior of parties participating in the standard by contract. Of particular relevance here, standard-setting organizations typically secure agreements wherein parties who contribute proprietary technology to the standard promise to license that technology on reasonable and nondiscriminatory ("RAND") terms. Absent such an agreement, the standard-setting organization will omit the technology in question from the standard. RAND licenses are thus part of a *quid pro quo*, representing the consideration contributing parties give to standard-setting organizations in exchange for the competitive benefits they will receive from gaining industry-wide acceptance of their preferred technologies.

The standard-setting organization responsible for developing standards for USB connectors is the USB Implementers Forum, Inc. ("USB–IF"), a non-profit organization founded by Intel in 1995. To protect against anticompetitive risks, the USB-IF required parties contributing to the USB 3.0 standard to sign the USB 3.0 Contributors Agreement (the "Contributors Agreement"). Lotes and the defendants have signed this agreement. Lotes and the defendants also signed USB 3.0 Adopters Agreement within the required

11

Adoption Period. Lotes and the defendants thus are both contributors to and adopters of the USB 3.0 standard.

As relevant here, paragraph 3.4 of the Contributors Agreement, entitled "Limited Patent Licensing Obligations in Contributions," obligates "Contributor[s]" to grant to any "Adopter" a "non-exclusive world-wide license under any Necessary Claim of a patent or patent application . . . on a royalty-free basis and under otherwise reasonable and nondiscriminatory ('RAND–Zero') terms . . . ." J.A. 79 (emphasis omitted). Under this provision, the defendants are obligated to provide RAND-Zero licenses to Lotes for all patent claims needed to practice the USB 3.0 standard.

In addition to this RAND-Zero provision, the Contributors Agreement also contains other provisions designed to prevent the USB-IF from becoming a forum for antitrust violations. Paragraph 2 provides in pertinent part:

> Contributor[s] . . . understand that in certain lines of business they are or may be direct competitors and that it is imperative that they and their representatives act in a manner which does not violate any state, federal or international antitrust laws and regulations. Without limiting the generality of the foregoing, Contributor[s] . . . acknowledge that this Agreement prohibits any communications regarding . . . exclusion of competitors or any other topic that may be construed as a violation of antitrust laws.

12

J.A. 78. Similarly, paragraph 6.12 provides: "Anything in this Agreement to the contrary notwithstanding, the obligations of the parties hereto shall be subject to all laws, present and future, of any government having jurisdiction over the parties hereto . . . ." J.A. 81. The agreement also contains a New York choice-of-law clause, as well as an exclusive choice-of-forum clause providing that "all disputes arising in any way out of this Agreement shall be heard exclusively in, and all parties irrevocably consent to jurisdiction and venue in, the state and Federal courts of New York, New York." J.A. 81.

The crux of Lotes's complaint is its claim that the defendants have brazenly flouted their obligations under the Contributors Agreement to provide RAND-Zero licenses to adopters of the USB 3.0 standard. To begin with, Lotes alleges that "Hon Hai and Foxconn have contacted the customers and distributors of Lotes to allege that they have the sole patent rights on USB 3.0 connectors and would sue them if they did not buy from Foxconn." J.A. 49–50. Hon Hai and Foxconn have also refused to provide RAND-Zero licenses to other manufacturers similarly situated to Lotes "and have sent out warning letters threatening those manufacturers with patent litigation." J.A. 50.

13

Foxconn has also allegedly disseminated its plans to monopolize the USB connector industry through the press. In a February 23, 2010 article, a Taiwanese trade press publication reported that Foxconn was "the first to obtain patents related to USB 3.0 products," which would enable it "initially [to] enjoy a monopolistic position." J.A. 106. The article also indicated—ominously, according to Lotes—that Foxconn would "definitely take note of whether its competitors' USB 3.0 products infringe its patents." *Id.*

Despite these worrisome signs, Lotes attempted to secure a RAND-Zero license from Hon Hai. On March 25, 2011, at Hon Hai's request, Lotes executed and returned a non-disclosure agreement to enable licensing negotiations to proceed. On April 20, 2011, Hon Hai's U.S. outside counsel informed Lotes that it was in the process of developing licensing agreements, and would be in contact in due course. But despite repeated inquiries from Lotes over the months that followed, Lotes never received a draft licensing agreement or any other further communication from Hon Hai or its licensing counsel.

On February 10, 2012, in an effort to quell concern about Hon Hai and Foxconn's commitment to their licensing obligations, in-house counsel for

14

Foxconn Electronics sent a letter, on Hon Hai letterhead, to the USB-IF's President and Chief Operating Officer. The letter stated that Hon Hai and Foxconn were "pleased to be active contributors of the USB 3.0 project and early signers of the USB Contributors Agreement." J.A. 47. The letter then "unequivocally affirm[ed]" Foxconn's commitment to license patent claims necessary to practice the USB 3.0 standard on RAND-Zero terms as required by the Contributors Agreement. *Id.* In addition, the letter also "unequivocally affirm[ed]" that Foxconn would provide RAND licenses for other intellectual property that is not strictly necessary to practice the USB 3.0 standard but that would be required to practice certain "optional features." *Id.*

These assurances notwithstanding, on July 9, 2012, Foxconn Kunshan filed patent infringement suits in China against two Chinese subsidiaries of Lotes. In their prayers for relief, these suits request orders enjoining two key Lotes factories from making and selling certain USB 3.0 connectors, as well as orders for the destruction of all existing infringing inventory and specialized manufacturing equipment. The patents asserted in these suits are jointly owned by Foxconn Kunshan and Hon Hai, and are derived from earlier patents filed in

15

the United States. According to Lotes, the asserted claims of these two patents fall within the defendants' licensing obligations under the Contributors Agreement, and therefore must be licensed to Lotes on RAND-Zero terms.

Lotes alleges that the defendants' actions have "resulted in confusion and uncertainty that has complicated and endangered all of Lotes'[s] existing and prospective business relationships." J.A. 57. If allowed to continue, the defendants' scheme will allegedly force Lotes to close its factories, eliminate it as a major competitor, and enable the defendants to become the dominant supplier in the market for USB 3.0 connectors. Moreover, other firms will take note of Lotes's fate, and thus the defendants' "willingness to bring suit against Lotes in contravention of the USB-IF RAND-Zero terms has an *in terrorem* effect capable of curbing competitive manufacture . . . across the full range of products incorporating USB 3.0 connectors." J.A. 58.

Given the central role Chinese manufacturing plays in the global electronics supply chain, moreover, Lotes alleges that curbing competition in China will have downstream effects worldwide, including in the United States. In Lotes's view, because any price increases in USB 3.0 connectors will

16

"inevitably" be passed on through each stage in the production process to consumers in the United States, J.A. 55, "[a]nything that affects the price, quantity, or competitive nature of the production market for USB 3.0 connectors will . . . have a direct, substantial, and reasonably foreseeable effect on U.S. commerce," J.A. 48. In this way, Lotes contends that its lost sales and potential elimination as a competitor in China will "damage competition, increase prices, and harm consumers in the United States." J.A. 55.

II.    *Procedural History*

Lotes filed suit against the defendants on October 4, 2012. On December 21, 2012, Lotes filed the operative First Amended Complaint, which asserts federal claims for violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and state-law claims for breach of contract, promissory estoppel, tortious interference with contracts and prospective business relations, a declaration of waiver, and a declaration of a license for all necessary patent claims. On January 11, 2013, the defendants filed a motion to dismiss, which Lotes duly opposed.

On May 14, 2013, the district court issued an Opinion and Order dismissing the First Amended Complaint in its entirety with prejudice under

17

Rule 12(b)(1) for lack of subject matter jurisdiction. Following this Court's decision in *Filetech*, 157 F.3d at 931–32, the district court held that the restrictions of the FTAIA are jurisdictional. The district court further held that Lotes had failed to plausibly allege the requisite "direct, substantial, and reasonably foreseeable effect" on U.S. domestic or import commerce under the FTAIA, and therefore dismissed the Sherman Act claims. The district court then declined to exercise supplemental jurisdiction over the remaining state-law claims, and denied Lotes's request for leave to amend.

The clerk entered final judgment on May 20, 2013. This appeal followed.

## DISCUSSION

"When reviewing the dismissal of a complaint for lack of subject matter jurisdiction, we review factual findings for clear error and legal conclusions *de novo*, accepting all material facts alleged in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012). Similarly, we review a district court's grant of a motion to dismiss for failure to state a claim *de novo*, "accepting all factual claims in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."

18

*Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "We review a district court's decision to grant or deny a party leave to amend a pleading under Federal Rule of Civil Procedure 15(a) for abuse of discretion." *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003).

## I.   *Subject Matter Jurisdiction*

As a threshold matter, we must address whether the limitations on antitrust claims set forth in the FTAIA are jurisdictional or substantive.[3]  As codified in section 6a of the Sherman Act, the FTAIA provides:

---

[3] The defendants contend that we may avoid deciding this question because the district court correctly dismissed Lotes's antitrust claims under the FTAIA, and nothing turns on whether or not that dismissal was properly jurisdictional. But jurisdiction is an issue distinct from and logically prior to the merits of a claim, and the Supreme Court has held that "the nonexistence of a cause of action [i]s no proper basis for a jurisdictional dismissal." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 96 (1998) (discussing *Bell v. Hood*, 327 U.S. 678, 682 (1946)). Furthermore, this uncertainty in our jurisprudence has been flagged by several district courts, *see, e.g.*, *In re Vitamin C Antitrust Litig.*, 904 F. Supp. 2d 310, 315 (E.D.N.Y. 2012); *Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 243 n.6 (S.D.N.Y. 2008), and we see no good reason to allow it to persist. *See Morrison v. Nat'l Austrl. Bank Ltd.*, 561 U.S. 247, 254 (2010) (holding that the lower courts erred in finding that the question of the extraterritorial reach of § 10(b) of the Securities and Exchange Act of 1934 was jurisdictional, even though "nothing in the analysis of the courts below turned on th[is] mistake").

19

Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless--

(1) such conduct has a direct, substantial, and reasonably foreseeable effect--

> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

> (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

15 U.S.C. § 6a.[4] The Supreme Court has explained this intricate provision as

follows:

This technical language initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.,* it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import, or

---

[4] The FTAIA is also codified in similar language in section 5 of the Federal Trade Commission Act. *See* 15 U.S.C. § 45(a)(3).

(certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.,* the "effect" must "giv[e] rise to a [Sherman Act] claim."

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004) (quoting 15 U.S.C. § 6a(1), (2)).

Congress enacted this statute with two principal purposes in mind. First, the statute seeks to boost American exports by "mak[ing] clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements (say, joint-selling arrangements), however anticompetitive, as long as those arrangements adversely affect only foreign markets." *Empagran*, 542 U.S. at 161 (citing H.R. Rep. No. 97-686, at 1–3, 9–10 (1982)). Second, Congress sought to clarify the legal standard determining when American antitrust law governs foreign conduct, which different courts had articulated in somewhat different ways. *See* H.R. Rep. No. 97-686, at 5–6 (1982). Congress thus "designed the FTAIA to clarify, perhaps to limit, but not to expand in any significant way, the Sherman Act's scope as applied to foreign commerce." *Empagran*, 542 U.S. at 169 (emphasis omitted).

In *Filetech*, this Court held that the FTAIA's limitations on antitrust claims involving foreign commerce are jurisdictional. *See Filetech*, 157 F.3d at 929–32. Following that binding decision, the district court below too treated the FTAIA's requirements as jurisdictional, though it acknowledged that "current thinking may point against" that position. J.A. 263. Lotes argues that the district court's ruling was erroneous and that *Filetech* is no longer good law in light of the Supreme Court's intervening decisions in *Arbaugh* and its progeny. We agree.

In *Arbaugh*, the Supreme Court confronted the question of whether a particular requirement in Title VII of the Civil Rights Act of 1964 affects federal courts' subject matter jurisdiction or is instead a substantive element of a claim on the merits. *See* 546 U.S. at 503. In particular, Title VII prohibits any "employer" from discriminating on protected grounds, 42 U.S.C. § 2000e-2(a)(1), and defines "employer" to include only those having "fifteen or more employees," *id.* § 2000e(b). Reversing the lower courts, the Supreme Court held that this employee-numerosity requirement goes to the merits of a claim rather than the jurisdiction of the court. *See Arbaugh*, 546 U.S. at 504. In so holding, the

22

Court announced a "readily administrable bright line" for when statutory requirements are jurisdictional:

> If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.

*Id.* at 515–16 (footnote and internal citation omitted). In just eight years since *Arbaugh*, the Supreme Court has repeatedly applied this clear-statement rule to find statutory requirements substantive rather than jurisdictional. *See, e.g.*, *Auburn Reg'l*, 133 S. Ct. at 824–26 (time limit for filing an appeal to the Provider Reimbursement Review Board under the Medicare statute); *Morrison v. Nat'l Austrl. Bank Ltd.*, 561 U.S. 247, 254 (2010) (extraterritorial reach of § 10(b) of the Securities and Exchange Act of 1934); *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160–66 (2010) (registration requirement under the Copyright Act).

In general, a panel of this Court is "bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court." *In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010) (quoting *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004)). However, where

"'there has been an intervening Supreme Court decision that casts doubt on our controlling precedent,' one panel of this Court may overrule a prior decision of another panel." *Id.* (quoting *Gelman v. Ashcroft*, 372 F.3d 495, 499 (2d Cir. 2004)). In this instance, lacking the Supreme Court's guidance and following the arguments of the parties before us, our decision in *Filetech* treated the FTAIA's requirements as jurisdictional with little analysis. *See Filetech*, 157 F.3d at 929–32. That holding now has been thoroughly undermined by *Arbaugh* and its progeny.

Applying the teaching of the *Arbaugh* line of cases, we have little difficulty concluding that the requirements of the FTAIA go to the merits of an antitrust claim rather than to subject matter jurisdiction. Nothing in the statute "speak[s] in jurisdictional terms or refer[s] in any way to the jurisdiction of the district courts." *Arbaugh*, 546 U.S. at 515 (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)). To the contrary, the statutory text refers to the "conduct" to which the Sherman Act "appl[ies]." As the Seventh Circuit has noted, "[t]his is the language of elements, not jurisdiction." *Minn-Chem*, 683 F.3d at 852. Moreover, both courts of appeals to have addressed this issue after *Arbaugh* have reached the same conclusion and have overruled their respective contrary

pre-*Arbaugh* precedents. *See id.* at 851–52; *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 467–68 (3d Cir. 2011). To the extent it holds that the FTAIA's requirements are jurisdictional, *Filetech* is no longer good law.

In urging a contrary conclusion, the defendants point to the structure of the Sherman Act, certain statements in the FTAIA's legislative history, principles of international comity, and dicta from the Supreme Court's decision interpreting the FTAIA in *Empagran*. None of these considerations is sufficient to overcome the teaching of *Arbaugh* and the clear text of the statute.

With respect to statutory structure, the defendants note that the FTAIA imposes a unique, separately codified threshold requirement on antitrust claims involving foreign conduct. Unlike claims involving purely domestic conduct, the FTAIA bars claims based on foreign conduct from proceeding unless the foreign conduct has a cognizable effect on the United States. Only if that prerequisite is satisfied may the plaintiff pursue a claim "under the provisions of section 1 to 7 of [the Sherman Act], other than [the FTAIA]." 15 U.S.C. § 6a(2).

But it is hardly uncommon for Congress to impose threshold requirements or to codify those requirements in separate provisions. In the Copyright Act, for

example, the threshold requirement for a plaintiff to register his or her copyright before filing an infringement action is codified at 17 U.S.C. § 411(a), separately from the general provisions governing infringement claims at 17 U.S.C. §§ 501–505. But that statutory structure did not prevent the Supreme Court in *Reed* from finding the registration requirement nonjurisdictional. *See Reed*, 559 U.S. at 160–66. Here, the FTAIA unmistakably imposes unique threshold requirements on antitrust claims involving foreign conduct, but nothing in the statute even suggests—much less "clearly states," *Arbaugh*, 546 U.S. at 515—that those requirements are jurisdictional.

The defendants' reliance on the FTAIA's legislative history fares no better. The statutory text plainly uses "the language of elements, not jurisdiction," *Minn-Chem*, 683 F.3d at 852, and courts "do not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994). Moreover, when the Supreme Court has instructed that jurisdictional requirements must be "clearly state[d]," *Arbaugh*, 546 U.S. at 515, looking beyond an unambiguously substantive statutory text is doubly unwarranted.

26

Furthermore, while the defendants point out that portions of the legislative history employ jurisdictional language, other portions speak in merits terms.[5] And even to the extent the legislative history mentions jurisdiction, "[j]urisdiction . . . is a word of many, too many meanings." *Arbaugh*, 546 U.S. at 510 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998)). Indeed, "the legal lexicon knows no word more chameleon-like than 'jurisdiction,'" *United States v. Yousef*, -- F.3d --, 2014 WL 1673281, at *3 (2d Cir. Apr. 29, 2014) (quoting *United States v. Sabella*, 272 F.2d 206, 209 (2d Cir. 1959)), and the Supreme Court, "no less than other courts, has sometimes been profligate in its use of the term," *Arbaugh*, 546 U.S. at 510. None of the jurisdictional references the defendants rely upon uses the term unambiguously to describe the adjudicative authority of U.S. courts rather than, somewhat less precisely, the prescriptive scope of U.S. law. *See, e.g.*, H.R. Rep. No. 97-686, at 13 (1982) (explaining that the statute addresses "the subject matter jurisdiction of *United*

---

[5] *Compare, e.g.*, H.R. Rep. No. 97-686, at 13 (1982) (explaining that the statute "address[es] only the subject matter jurisdiction of United States antitrust law," rather than "the legal standards for determining whether conduct violates the antitrust laws"), *with id.* at 7 (explaining that the statute amends the Sherman Act "to more clearly establish when antitrust *liability* attaches to international business activities" (emphasis added)), *and id.* at 7–8 (explaining that the statute clarifies when "restraints on export trade . . . *violate* the Sherman Act" (emphasis added)).

27

*States antitrust law*" (emphasis added)). Given that the judiciary often conflated these concepts until the Supreme Court began in recent years "to bring some discipline to the use of this term," *Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1202 (2011), Congress's loose language is hardly surprising.

Similarly unpersuasive is the defendants' invocation of the canon of statutory interpretation whereby courts "ordinarily construe[] ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations." *Empagran*, 542 U.S. at 164. Even assuming that construing the FTAIA to be jurisdictional would serve the interests of international comity, the statute is not ambiguous. And even if it were ambiguous, the Supreme Court has specifically instructed us to treat statutory limitations as nonjurisdictional unless Congress "clearly states" otherwise. *Arbaugh*, 546 U.S. at 515.

Finally, the defendants point to two arguably jurisdictional statements from the Supreme Court's decision in *Empagran*. First, the Court quoted a statement from the FTAIA's legislative history to the effect that "there should be no American antitrust jurisdiction absent a direct, substantial and reasonably foreseeable effect on domestic commerce or a domestic competitor." 542 U.S. at

163 (quoting H.R. Rep. No. 97-686, at 9–10). And second, the Court approvingly

quoted a statement from a Fifth Circuit decision, which reported finding "no

case in which jurisdiction was found in a case like [*Empagran*]." *Id.* at 170

(quoting *Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420, 429 (5th

Cir. 2001)). We note that the Court also quoted a treatise arguing that Congress

would not have intended the FTAIA to "provide worldwide subject matter

jurisdiction to any foreign suitor wishing to sue its own local supplier" for

conduct that has independent effects on U.S. commerce. *Id.* at 166 (quoting

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 273, at 51–52 (Supp.

2003)).

But again, "[j]urisdiction . . . is a word of many, too many meanings."

*Arbaugh*, 546 U.S. at 510 (quoting *Steel*, 523 U.S. at 90). And *Empagran* was

decided in 2004, before *Arbaugh* was handed down in 2006, and the Supreme

Court has confessed to being imprecise in its use of jurisdictional language prior

to *Arbaugh*. *See Arbaugh*, 546 U.S. at 510. Furthermore, the jurisdictional

references in *Empagran* appear in quotations from other sources, and the opinion

also contains language that describes the FTAIA in decidedly nonjurisdictional

29

terms. As the Seventh Circuit has noted, the Court in *Empagran* "spoke, for example, of the FTAIA's 'removing from the Sherman Act's reach' certain types of conduct, and whether it was reasonable under the facts presented there 'to apply this law to conduct that is significantly foreign.'" *Minn-Chem*, 683 F.3d at 852 (quoting *Empagran*, 542 U.S. at 161, 166). The defendants' reliance on *Empagran* is thus misplaced.

Accordingly, notwithstanding our contrary prior decision in *Filetech*, we are compelled under *Arbaugh* and its progeny to conclude that the requirements of the FTAIA are substantive and nonjurisdictional.

II.    *Waiver of the FTAIA*

Because we hold the requirements of the FTAIA to be nonjurisdictional, we must address Lotes's argument that the defendants have waived those requirements by contract in this case.

In this regard, Lotes points to five provisions of the Contributors Agreement. First, paragraph 2 recites the contributors' understanding "that it is imperative that they and their representatives act in a manner which does not violate any state, federal or international antitrust laws and regulations." J.A. 78.

Second, this paragraph also "prohibits any communications regarding . . . exclusion of competitors or any other topic that may be construed as a violation of antitrust laws." *Id.* Third, paragraph 6.6 provides that the Agreement is to be "construed and controlled" by New York law. J.A. 81. Fourth, paragraph 6.7 provides that "all disputes arising in any way out of this Agreement shall be heard in, and all parties irrevocably consent to jurisdiction and venue in, the state and Federal courts of New York, New York." *Id.* And finally, paragraph 6.12 provides that "the obligations of the parties hereto shall be subject to all laws, present and future, of any government having jurisdiction over the parties hereto." *Id.* According to Lotes, these provisions establish that the defendants "have agreed to subject their conduct to U.S. antitrust scrutiny." Appellant's Br. at 25.

There are two fundamental problems with this argument. First and foremost, Lotes did not raise this issue before the district court, and "[i]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006) (quoting *Greene v. United States,* 13 F.3d 577, 586 (2d Cir.1994)).

31

Second, even if we were to exercise our discretion to consider this forfeited issue, *see id.*, Lotes's argument is meritless. Even assuming *arguendo* that the substantive requirements of the FTAIA are waivable, *but see New York v. Hill*, 528 U.S. 110, 116 (2000) ("[A] 'right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy.'" (emphasis omitted) (quoting *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 704 (1945)), nothing in the cited contractual provisions suggests that the defendants have waived those requirements here. The first portion of paragraph 2 merely recites the parties' understanding that they are subject to various antitrust laws and regulations and affirms the parties' commitment to abide by their existing legal obligations. The second portion of paragraph 2 prohibits the parties from engaging in anticompetitive "communications." Paragraphs 6.6 and 6.7 are nothing more than standard choice-of-law and choice-of-forum clauses. And paragraph 6.12 again merely reiterates the parties' existing obligation to comply with all applicable laws.

At most, paragraph 6.12 and the first portion of paragraph 2 can be read to recognize and incorporate into the Contributors Agreement the signatories'

32

preexisting obligations under U.S. antitrust law. But these contractual provisions do not waive any statutory requirements or otherwise alter the scope of the signatories' legal obligations. Put differently, the Contributors Agreement affirms that the defendants must abide by the Sherman Act to the extent it properly applies. But the defendants remain free to argue that, under the FTAIA, the Sherman Act does not apply to or regulate the conduct at issue in this case. The defendants have not waived their defenses under the FTAIA.

III.  *"Direct, Substantial, and Reasonably Foreseeable Effect" under the FTAIA*

We now turn to the issue of whether Lotes has plausibly alleged that the defendants' anticompetitive conduct has a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic or import commerce under the FTAIA. The district court answered this question in the negative. Lotes and *amici* contend that the district court erred by misinterpreting the FTAIA and applying the wrong legal standard. We agree.

In dismissing Lotes's antitrust claims for failure to satisfy the FTAIA's domestic effects exception, the district court relied heavily on the Ninth Circuit's decision in *LSL*, which construed the statutory requirement of a "direct . . .

33

effect." *See LSL*, 379 F.3d at 680. Borrowing from a Supreme Court case interpreting a similar term in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 –1611, the Ninth Circuit held that "an effect is 'direct' if it follows as an immediate consequence of the defendant's activity." *LSL*, 379 F.3d at 680 (citing *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 618 (1992)). Applying that standard to this case, the district court below found "a disconnect between the relevant (foreign) market as defined by plaintiff (USB 3.0 connectors)—the market which defendants are allegedly attempting to monopolize—and the U.S. market supposedly affected by defendants' attempted monopolization (notebooks, desktop computers, servers, etc.)." J.A. 265 (footnote omitted). The district court concluded that "[t]o the extent that defendants' foreign anti-competitive conduct may result in higher computer prices and less competition here in the U.S., those effects are simply too attenuated to establish the proximate causation required by the FTAIA." *Id.*

The district court also expressed doubts about the substantiality of any domestic effects. Distinguishing a decision of the Northern District of California in *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 822 F. Supp. 2d 953 (N.D. Cal.

2011), the district court noted that this case contains no allegations of direct price-fixing, that USB connectors are only one small component of the finished computer products that are ultimately sold in the United States, and that Lotes's market share allegations lack particularity in some respects. The district court also observed that "a whole host of factors other than the price of USB 3.0 connectors influence the price of domestic computer products." J.A. 272. The district court thus found that "[t]he indirect effect of defendants' conduct on prices of U.S. computer goods, if any, cannot be quantified." *Id.* This conclusion bolstered the district court's ultimate finding that, "[a]t most, . . . defendants' conduct may cause 'ripple' effects" in the United States, but such effects "are simply too attenuated to bring plaintiff's foreign injury within the ambit of the Sherman Act." *Id.*

In applying the interpretation of "direct . . . effect" set forth in *LSL*, whereby an effect is "direct" if it follows as an immediate consequence, the district court appears not to have considered the alternative approach advocated by the United States and the FTC and adopted by the Seventh Circuit in its en banc decision in *Minn-Chem*. Under that approach, "the term 'direct' means only

'a reasonably proximate causal nexus.'" *Minn-Chem*, 683 F.3d at 857 (quoting

Makan Delrahim, *Drawing the Boundaries of the Sherman Act: Recent Developments*

*in the Application of the Antitrust Laws to Foreign Conduct*, 61 N.Y.U. Ann. Surv.

Am. L. 41, 430 (2005)). We agree with Lotes and *amici* that this less stringent

approach reflects the better reading of the statute.

The court in *LSL* relied on two interpretive sources for its contrary

holding. First, it quoted Webster's Third New International Dictionary, which

defines "direct" as "proceeding from one point to another in time or space

without deviation or interruption." *LSL*, 379 F.3d at 680 (quoting Webster's Third

New Int'l Dictionary 640 (1981)). But the same dictionary also defines "direct" as

"characterized by or giving evidence of a close especially logical, causal, or

consequential relationship." Webster's Third New Int'l Dictionary 640 (1981).

Although this is an alternative definition, "the relative order of the common

dictionary definitions of a single term does little to clarify that term's meaning

within a particular context. When a word has multiple definitions, usage

determines its meaning." *Trs. of Chic. Truck Drivers, Helpers & Warehouse Workers*

*Union (Indep.) Pension Fund v. Leaseway Transp. Corp.*, 76 F.3d 824, 828 n.4 (7th Cir. 1996).[6]

The court in *LSL* also relied upon the Supreme Court's interpretation of a "nearly identical term" in the FSIA in *Weltover*. *LSL*, 379 F.3d at 680. But the Supreme Court has cautioned that courts "must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (quoting *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 393 (2008)). Indeed, "[m]ost words have different shades of meaning and consequently may be variously construed, not only when they occur in different statutes, but when used more than once in the same statute or even the same section." *Env. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (quoting *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)).

---

[6] We recognize that Webster's Third has not garnered universal respect among the Justices of the Supreme Court. *See, e.g., Taniguchi v. Kan Pac. Saipan, Ltd.,* 132 S. Ct. 1997, 2003 (2012); *MCI Telecomm. Corp. v. AT&T Co.,* 512 U.S. 218, 228 n.3 (1994). But other dictionaries published roughly contemporaneously with the enactment of the FTAIA contain similar definitions. *See, e.g.,* 4 Oxford English Dictionary 702 (2d ed. 1989) (defining "direct" as, among other things, "[s]traight; undeviating in course; not circuitous or crooked" and "[p]roceeding from antecedent to consequent, from cause to effect, etc.; uninterrupted, immediate").

Here, both the purpose and the language of the FSIA and FTAIA differ in critical respects. With respect to purpose, the FSIA codifies foreign nations' sovereign immunity from suit, and "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). The boundaries of the statutory exceptions to sovereign immunity, including the "direct effect" exception construed in *Weltover*, must be carefully patrolled to preserve the FSIA's "general rule of immunity." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 114 (2d Cir. 2013). The FTAIA, by contrast, is a substantive antitrust statute designed "to clarify . . . the Sherman Act's scope as applied to foreign commerce." *Empagran*, 542 U.S. at 169.

Textually, moreover, *Weltover* construed the FSIA's phrase "direct effect," while the FTAIA contains the fuller phrase "direct, substantial, and reasonably foreseeable effect." Even more to the point, the Supreme Court in *Weltover* arrived at its understanding of "direct effect" in the FSIA only after refusing to import from the statute's legislative history any notion that an effect is "direct" only if it is also both "substantial" and "foreseeable." *See Weltover*, 504 U.S. at

617. In the Supreme Court's words: "[W]e reject the suggestion that § 1605(a)(2) contains any unexpressed requirement of 'substantiality' or 'foreseeability.'" *Id.* at 618. Only then did the Supreme Court endorse the lower court's interpretation, whereby "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity.'" *Id.* (quoting *Weltover, Inc. v. Republic of Arg.*, 941 F.3d 145, 152 (2d Cir. 1991)).

This textual difference between the FSIA and FTAIA is critically important. As *Minn-Chem* succinctly explains,

> No one needs to read the words "substantial" and "foreseeable" into the FTAIA. Congress put them there, and in so doing, it signaled that the word "direct" used along with them had to be interpreted as part of an integrated phrase. Superimposing the idea of "immediate consequence" on top of the full phrase results in a stricter test than the complete text of the statute can bear.

683 F.3d at 857. Indeed, *LSL*'s reading of the FTAIA would violate the "cardinal principle of statutory construction" that statutes must be construed, if reasonably possible, so that "no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). Reading "direct" as "immediate" would rob the separate "reasonabl[e] foreseeab[ility]" requirement of any meaningful function,

since we are hard pressed to imagine any domestic effect that would be both "immediate" and "substantial" but not "reasonably foreseeable." Furthermore, we must remember that "[i]mport trade and commerce are excluded at the outset from the coverage of the FTAIA in the same way that domestic interstate commerce is excluded." *Minn-Chem*, 683 F.3d at 854; *see also* 15 U.S.C. § 6a (providing that, unless an exception applies, the Sherman Act "shall not apply to conduct involving trade or commerce (*other than import trade or import commerce*) with foreign nations" (emphasis added)). To demand that any domestic effect must follow as an immediate consequence of a defendant's foreign anticompetitive conduct would all but collapse the FTAIA's domestic effects exception into its separate import exclusion.

Interpreting "direct" to require only a reasonably proximate causal nexus, by contrast, avoids these problems while still addressing antitrust law's classic aversion to remote injuries. Indeed, "directness" is one of the traditional formulations courts have used to talk about the common-law concept of proximate causation. *See, e.g.*, *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992) (describing common-law proximate causation as "a demand for some

40

direct relation between the injury asserted and the injurious conduct alleged"). And courts have long applied notions of proximate causation, using the language of "directness," in determining what types of injuries the antitrust laws may properly redress. In the early twentieth century, for example, before the Supreme Court's regime-changing Commerce Clause decision in *Wickard v. Filburn*, 317 U.S. 111 (1942), courts commonly held that anticompetitive schemes whose effects on interstate commerce were merely "'incidental,' 'indirect,' or 'remote,'" were, "under the prevailing climate, beyond Congress'[s] power to regulate, and hence outside the scope of the Sherman Act." *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 230 (1948). And today, courts continue to analyze antitrust standing by considering, among other factors, the "directness or indirectness of the asserted injury," *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540 (1983), using familiar principles of proximate causation, *see Blue Shield of Va. v. McCready*, 457 U.S. 465, 476–77 & n.13 (1982).

Of course, proximate causation is a notoriously slippery doctrine. "In a philosophical sense, the consequences of an act go forward to eternity, and the

causes of an event go back to the dawn of human events, and beyond." *CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2642 (2011) (quoting W. Page Keeton et al., Prosser and Keeton on Torts § 42, at 264 (5th ed. 1984)). Proximate causation is thus "shorthand for a concept: Injuries have countless causes, and not all should give rise to legal liability." *Id.* at 2637. The doctrine of proximate causation provides the legal vocabulary for drawing this line—courts ask, for example, "whether the injury that resulted was within the scope of the risk created by the defendant's [wrongful] act; whether the injury was a natural or probable consequence of the [conduct]; whether there was a superseding or intervening cause; whether the [conduct] was anything more than an antecedent event without which the harm would not have occurred." *Id.* at 2652 (Roberts, C.J., dissenting). "The proximate-cause inquiry is not easy to define, and over the years it has taken various forms; but courts have a great deal of experience applying it, and there is a wealth of precedent for them to draw upon in doing so." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014).

While *Minn-Chem*'s "reasonably proximate causal nexus" standard incorporates all of this useful judicial experience, *LSL*'s "immediate consequence" standard focuses narrowly on a single factor—the spatial and temporal separation between the defendant's conduct and the relevant effect. Herein lies the error of the decision below, which placed near-dispositive weight on the fact that USB 3.0 connectors are manufactured and assembled into finished computer products "*in China*" before being sold in the United States. J.A. 264. This kind of complex manufacturing process is increasingly common in our modern global economy, and antitrust law has long recognized that anticompetitive injuries can be transmitted through multi-layered supply chains. Indeed, the Supreme Court has held that claims by indirect purchasers are "consistent with the broad purposes of the federal antitrust laws: deterring anticompetitive conduct and ensuring the compensation of victims of that conduct." *California v. ARC Am. Corp.*, 490 U.S. 93, 102 (1989).[7]

---

[7] We recognize that in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held that indirect purchasers may not recover treble damages under § 4 of the Clayton Act. *See id.* at 728–29. But in so holding, the Court in no way implied that anticompetitive injuries cannot be passed through to subsequent purchasers; to the contrary, the Court acknowledged that its rule "denies recovery to those indirect purchasers who may have been actually injured by antitrust violations." *Id.* at 746. Instead, the Court relied upon on practical considerations related to double recovery, apportionment, and deterrence. *See id.* at 730, 735, 737. The indirect purchaser

There is nothing inherent in the nature of outsourcing or international supply chains that necessarily prevents the transmission of anticompetitive harms or renders any and all domestic effects impermissibly remote and indirect. Indeed, given the important role that American firms and consumers play in the global economy, we expect that some perpetrators will design foreign anticompetitive schemes for the very purpose of causing harmful downstream effects in the United States. Whether the causal nexus between foreign conduct and a domestic effect is sufficiently "direct" under the FTAIA in a particular case will depend on many factors, including the structure of the market and the nature of the commercial relationships at each link in the causal chain. Courts confronting claims under the FTAIA will have to consider all of the relevant facts, using all of the traditional tools courts have used to analyze questions of proximate causation.

---

doctrine, moreover, is subject to exceptions, *see Simon v. KeySpan Corp.*, 694 F.3d 196, 202 (2d Cir. 2012), does not preempt state laws providing for damages claims by indirect purchasers, *see ARC Am.*, 490 U.S. at 102, and does not apply to claims for equitable relief, *see In re Air Cargo Shipping Servs. Antitrust Litig.*, 697 F.3d 154, 157 (2d Cir. 2012); *see also U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003). Furthermore, this Court has not had occasion to consider the extent to which *Illinois Brick* applies when any direct purchaser claim would be barred by the FTAIA. *But see Motorola Mobility LLC v. AU Optronics Corp.*, 746 F.3d 842, 844 (7th Cir. 2014) (indicating that *Illinois Brick* would continue to apply).

In this case, however, we need not decide the rather difficult question of whether the defendants' foreign anticompetitive conduct has a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic or import commerce, as that phrase is properly understood. That is because even assuming that Lotes has plausibly alleged a domestic effect, that effect did not "give[] rise to" Lotes's claims. 15 U.S.C. § 6a(2).

IV.     *"Gives Rise to a Claim" under the FTAIA*

It is well settled that this Court "may affirm on any basis for which there is sufficient support in the record, including grounds not relied on by the district court." *Bruh v. Bessemer Venture Partners III L.P.*, 464 F.3d 202, 205 (2d Cir. 2006). Although the issue was not raised or ruled upon below, *amici* urge us to affirm the district court's judgment on the alternative ground that any domestic effect caused by the defendants' foreign anticompetitive conduct did not "give[] rise to" Lotes's claims. 15 U.S.C. § 6a(2). We agree.

To review the statutory framework, the FTAIA generally excludes wholly foreign conduct from the reach of the Sherman Act, but brings such conduct back within the statute's scope where two requirements are met: (1) the foreign

45

conduct has a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic, import, or certain export commerce, *id.* § 6a(1); and (2) that effect "gives rise to a claim under" the Sherman Act, *id.* § 6a(2). In *Empagran*, the Supreme Court held that the statutory phrase "gives rise to a claim" means "gives rise to *the plaintiff's* claim." *See Empagran*, 542 U.S. at 173. After considering the legislative history and principles of international comity, the Court concluded that "Congress would not have intended the FTAIA's exception to bring independently caused foreign injury within the Sherman Act's reach." *Id.* The FTAIA thus includes two distinct causation inquiries, one asking whether the defendants' foreign conduct caused a cognizable domestic effect, and the other asking whether that effect caused the plaintiff's injury.

Under this second inquiry, in the wake of *Empagran*, three courts of appeals have considered what kind of causal connection is necessary for a domestic effect to "give[] rise to" a plaintiff's claim. Consistent with the comity canon and general antitrust principles, these courts have held that the domestic effect must proximately cause the plaintiff's injury. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 987 (9th Cir. 2008) ("Like

the D.C. Circuit and the Eighth Circuit, we . . . adopt a proximate causation standard."); *In re Monosodium Glutamate Antitrust Litig.*, 477 F.3d 535, 538 (8th Cir. 2007) ("[T]he statutory 'gives rise to' language requires a direct or proximate causal relationship . . . ."); *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1271 (D.C. Cir. 2005) ("The statutory language—'gives rise to'—indicates a direct causal relationship, that is, proximate causation . . . ."). Agreeing with our sister circuits, we adopt that standard here.

We thus must determine whether any domestic effect resulting from the defendants' anticompetitive conduct proximately caused Lotes's injury. We conclude that it did not. Lotes alleges that the defendants' foreign conduct had the effect of driving up the prices of consumer electronics devices incorporating USB 3.0 connectors in the United States. But those higher prices did not cause Lotes's injury of being excluded from the market for USB 3.0 connectors—that injury flowed directly from the defendant's exclusionary foreign conduct. Lotes's complaint thus seeks redress for precisely the type of "independently caused foreign injury" that *Empagran* held falls outside of Congress's intent. *Empagran*, 542 U.S. at 173.

47

Indeed, to the extent there is any causal connection between Lotes's injury and an effect on U.S. commerce, the direction of causation runs the wrong way. Lotes alleges that the defendants' patent hold-up has excluded Lotes from the market, which reduces competition and raises prices, which are then passed on to U.S. consumers. Lotes's injury thus *precedes* any domestic effect in the causal chain. And "[a]n effect never precedes its cause." *Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 765 (2d Cir. 1984).

Attempting to evade this problem, Lotes argues that higher prices for U.S. consumers are not the only domestic effect of the defendants' conduct. According to Lotes, while higher U.S. prices may be the only domestic effect resulting from the defendants' patent infringement suits in China, the defendants' scheme is broader than that. Lotes contends that the defendants have also failed to license the necessary claims of certain U.S. patents, which has had the effect of foreclosing competition in the United States. That domestic effect, Lotes maintains, has proximately caused Lotes's injury.

This creative argument runs into several difficulties. As an initial matter, we are skeptical that the defendants' refusal to license their U.S. patents has

48

resulted in any domestic foreclosure of competition. Lotes has not alleged that it manufactures products in the United States, imports products into this country, or otherwise does business here. It is thus unclear why Lotes believes it even needs a U.S. license from the defendants in order to operate. *See* 35 U.S.C. § 271(a) (providing that a person infringes a patent if, "without authority," the person "makes, uses, offers to sell, or sells any patented invention, *within the United States or imports into the United States* any patented invention during the term of the patent therefor" (emphasis added)). And even to the extent a license is in fact necessary, Lotes alleges that, by virtue of the Contributors Agreement, it "either *already has* . . . or *has an irrevocable right* to a RAND-Zero license" for all patent claims and other intellectual property necessary to practice the USB 3.0 standard. J.A. 51. The alternative domestic effect Lotes relies upon is thus illusory.

In any event, any domestic effect resulting from the defendants' failure to license their U.S. patents did not proximately cause Lotes's injury. Indeed, any such effect is not even a factual, "but for" cause of Lotes's injury. Even if the defendants had granted Lotes a U.S. license, Lotes would still be excluded from

49

the USB 3.0 market by virtue of the defendants' independent infringement suits in China. But for the failure to license, Lotes would have suffered the same harm.

Nor is this one of those rare cases in which an injurious event is "overdetermined" by multiple sufficient causes. *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 27 (2010) ("If multiple acts occur, each of which . . . alone would have been a factual cause of the physical harm at the same time in the absence of the other act(s), each act is regarded as a factual cause of the harm."). Nothing in the complaint suggests that the defendants' failure to license U.S. patents, standing alone, would have been sufficient to exclude Lotes from the market. Indeed, the U.S. patents are so incidental to the alleged scheme that the complaint does not even bother to mention them except as part of the background of the relevant Chinese patents. *See* J.A. at 51 (explaining that the Chinese patents "claim priority to" the U.S. patents, and thus "the specifications of these U.S. patents must support all claims in the corresponding Chinese patents"); J.A. 54 (similarly discussing the U.S. patents as background). Read as a whole, the complaint makes perfectly clear that the true source of Lotes's injury

is the "[d]efendants' willingness to bring suit against Lotes in contravention of the USB-IF RAND-Zero terms." J.A. 58.[8]

Accordingly, even assuming that the defendants' anticompetitive conduct caused a "direct, substantial, and reasonably foreseeable effect" in the United States, any such effect did not "give[] rise to" Lotes's claim. We therefore affirm the decision below on alternative grounds.

## V.   *Leave to Amend*

Finally, Lotes argues that the district court abused its discretion in denying it a second opportunity to amend its complaint. In light of our conclusion that any domestic effect did not "give[] rise to" Lotes's claim, amendment would be futile. *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012) ("Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) . . . ."). We therefore affirm the denial of leave to amend.

---

[8] To the extent Lotes intends to frame the defendants' failure to license U.S. patents as the basis of a separate claim based on purely domestic conduct, which would not be subject to the limitations of the FTAIA, such a claim would fail for the same reasons. "[L]ack of causation in fact is fatal to the merits of any antitrust claim." *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir. 1986).

## CONCLUSION

For the foregoing reasons, the judgment of the district court is

**AFFIRMED**.