17-783-cv
*NRP Holdings LLC v. City of Buffalo*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term, 2017

(Argued:  January 31, 2018      Decided:  February 20, 2019)

Docket No. 17-783-cv

NRP HOLDINGS LLC, NRP PROPERTIES LLC,

*Plaintiffs-Appellants*,

–v.–

CITY OF BUFFALO, BYRON W. BROWN, DEMONE A. SMITH, BUFFALO URBAN
RENEWAL AGENCY, STEVEN M. CASEY,

*Defendants-Appellees*,

RICHARD A. STENHOUSE, BUFFALO JEREMIAH PARTNERSHIP FOR COMMUNITY
DEVELOPMENT, INC., JOHN DOE 1-10, JOHN DOE COMPANIES, 1-5,

*Defendants.*[*]

B e f o r e :

SACK, PARKER, and CARNEY, *Circuit Judges*.

---

[*] The Clerk of Court is directed to amend the case caption to conform to the above.

Plaintiffs-Appellants NRP Holdings LLC and NRP Properties LLC (together, "NRP") made preliminary arrangements from 2007 through 2009 with the City of Buffalo to build affordable housing on City-owned land and to finance the project in part with public funds. The project never came to fruition, allegedly because NRP refused to hire a political ally of the mayor. NRP sued the City, the Buffalo Urban Renewal Agency, the mayor, and other City officials, seeking redress. Between 2012 and 2017, the United States District Court for the Western District of New York (Skretny, *J.*) resolved all of NRP's claims in favor of defendants, some by dismissal under Rules 12(b)(6) and 12(c) and others by summary judgment. NRP appeals. We affirm. NRP's civil RICO claim against the City officials is barred by common-law legislative immunity because the mayor's refusal to take the final steps necessary to approve the project was discretionary legislative conduct, and NRP's prima facie case would require a factfinder to inquire into the motives behind that protected conduct. NRP's "class of one" Equal Protection claim was properly dismissed because NRP failed to allege in sufficient detail the similarities between NRP's proposed development and other projects that previously received the City's approval. NRP's claim for breach of contract was properly dismissed because the City's "commitment letter" did not create a binding preliminary contract in conformity with the Buffalo City Charter's requirements for municipal contracting. Finally, NRP fails to state a claim for promissory estoppel. Under New York law, promissory estoppel is unavailable against municipal entities except in rare cases of "manifest injustice." *N.Y. State Med. Transporters Ass'n, Inc. v. Perales*, 77 N.Y.2d 126, 130 (1990). NRP's claim in the end fails to meet this demanding standard.

AFFIRMED.

---

> NELSON PEREL (Thomas S. Lane, *on the brief*), Webster Szanyi LLP, Buffalo, NY, *for Plaintiffs-Appellants*.

2

MICHAEL A. BRADY (Daniel J. Brady, *on the brief*), Hagerty & Brady, Buffalo, NY, *for Defendants-Appellees City of Buffalo, Byron W. Brown, and Demone A. Smith.*

RICHARD T. SULLIVAN, Harris Beach PLLC, Buffalo, NY, *for Defendant-Appellee Buffalo Urban Renewal Agency.*

Rodney O. Personius, Personius & Melber LLP, Buffalo, NY, *for Defendant-Appellee Steven M. Casey.*

SUSAN L. CARNEY, *Circuit Judge*:

We confront here primarily a question of legislative immunity raised by a mayor's inaction in the face of well-developed but extra-contractual expectations of the prospective developer of a low-income housing project.

A real estate development team that included plaintiffs-appellants NRP Holdings LLC and NRP Properties LLC (together, "NRP") made preliminary arrangements with the City of Buffalo ("Buffalo," or the "City") from 2007 to 2009 to build affordable housing on City-owned land, a project that would be financed in large part by public grants, loans, and tax exemptions (the "Project"). As the planning phase drew to a close, NRP felt pressure from the City to hire an organization sponsored by a political ally of Mayor Byron W. Brown as a contractor on the Project. After NRP hired a different contractor—one that, in NRP's estimation, offered a more attractive proposal at lower cost—the City failed to take the steps necessary to approve the Project, and the whole undertaking died on the vine.

In the aftermath, NRP filed suit seeking damages in the United States District Court for the Western District of New York (Skretny, *J.*). As defendants, NRP named, *inter alia*, the City, the City's Urban Renewal Agency, and three City officials (the latter three, the "individual defendants"): Mayor Brown; Deputy Mayor Steven M. Casey; and

3

Demone A. Smith, a member of the Buffalo Common Council (the City's legislative body). From 2012 through 2017, the District Court issued orders that resolved all of NRP's claims in defendants' favor, some by dismissal under Federal Rule of Civil Procedure 12(b)(6) and 12(c), and others by award of summary judgment under Rule 56. NRP now appeals the District Court's 2017 final judgment as to four claims that it lodges against all of these defendants: one under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968; an equal protection claim asserted under 42 U.S.C. § 1983; and two New York common-law claims, one for breach of contract and one under a theory of promissory estoppel.

We are troubled by the implications of the evidence that NRP adduced in support of its claims. That evidence suggests that defendants' motives for scuttling the Project—a development that, it appears, might have benefited low-income individuals and families in Buffalo—stemmed from either caprice or a form of political engagement whose ethical valence seems dubious. Nonetheless, as a matter of law, we conclude that NRP's damages claims fail. We therefore AFFIRM the District Court's judgment in favor of defendants.

## BACKGROUND

### I.  Factual background

The following account is drawn from the record before the District Court when it adjudicated defendants' motions for summary judgment.[2] The facts as described here are undisputed by the parties unless otherwise indicated.

---

[2] This evidence is relevant to our review of the District Court's summary judgment rulings, but we look only to NRP's pleadings when reviewing the District Court's earlier rulings on defendants' Rule 12 motions.

A.    The proposed affordable housing project

In late 2007, NRP's development team began discussions with the City and the City of Buffalo Urban Renewal Agency ("BURA") about a possible affordable housing project to be located on Buffalo's East Side.[3] The Project was dubbed "East Side Housing Opportunities II" ("East Side II") because it was intended to resemble a recent similar development project in the City, "East Side Housing Opportunities I" ("East Side I"), in which certain members of NRP's development team had played key roles.

As they had for East Side I, the parties developed a plan under which NRP would purchase real property from the City and finance construction of the buildings and infrastructure with a combination of private funds and four types of public support:

(1)  Federal "HOME" fund loans, which are made available under the HOME Investment Partnerships Program and allocated by state and local entities like BURA, *see* 42 U.S.C. §§ 12741–12756;

(2)  An agreement for "payments in lieu of taxes" (a "PILOT agreement"), under which NRP would be exempted from local and county property taxes, and would instead comply with a predefined schedule of payments to the City and to Erie County;

(3)  State tax credits provided under the New York State Low-Income Housing Tax Credit Program, *see* N.Y. Pub. Hous. Law §§ 21–25; and

---

[3] In early 2008, NRP entered into an agreement with the Belmont Shelter Corporation ("Belmont") under which Belmont would act as a developer on the Project, while NRP would act as general contractor and assume responsibility for obtaining the necessary government approvals. NRP later agreed to absorb Belmont's Project-related expenses in exchange for an assignment of Belmont's Project-related rights and legal claims. In light of that assignment, it is unnecessary here to differentiate between the two companies' specific roles, and so we will refer to "NRP" when describing actions taken by either company with respect to the Project.

(4) A low-interest loan from the New York State Housing Trust Fund, *see* N.Y. Priv. Hous. Fin. Law §§ 1100–1103.

Not surprisingly, each of these programs requires various applications and sets processes for obtaining the necessary governmental approvals. As relevant for this appeal, Buffalo municipal law provides that the City may enter into contracts for transfers of City-owned property and for PILOT agreements only if such contracts have been approved by a vote of the City's legislative body, called the "Common Council." City law vests Buffalo's mayor with broad discretion over whether to introduce to the Common Council the resolutions necessary to secure City approval.

B.    The Wanamaker letter

In February 2008, the City and BURA set forth the fundamentals of their undertakings with regard to East Side II in a series of letters addressed to NRP by Timothy Wanamaker, who then served as BURA's Vice President and (concurrently) as the Executive Director of Buffalo's Office of Strategic Planning. Most relevant for our purposes is a letter addressed to NRP and dated February 25, 2008 (the "Wanamaker letter").

In what he called a "commitment letter," Wanamaker described East Side II as "redevelop[ing] a significant number of long vacant properties and creat[ing] much needed affordable housing" in Buffalo by providing "fifty . . . units of single-family homes in the Masten Park and Cold Springs neighborhoods." App'x 408-09. He confirmed to NRP that BURA had "earmarked" $1.6 million in HOME funds for the Project, App'x 408, noting at the same time that before issuing any such funds, "BURA is required to meet all applicable Federal, State and local rules and regulations," App'x 409. Wanamaker also declared that "[t]he City will provide" $1.6 million in HOME funds, will extend its "usual" Low-Income Housing PILOT agreement to NRP, and will

6

provide "51 buildable vacant lots . . . at a price no greater than $2,000 per buildable lot, and not to exceed a total price of $100,000." *Id.* He cautioned, still, that "[t]his commitment letter is only valid if [NRP] is successful in securing a 2008 Low-Income Housing Tax Credit allocation to complete the project" from New York State. *Id.*

C.      Preliminary steps, but no final approval

In 2008 and early 2009, the City, BURA, and NRP took further steps to make East Side II a reality. The City proposed a list of specific lots to be included in the Project. BURA unanimously passed a resolution allocating $1.6 million in federal HOME funds to the Project, an allocation decision that was then approved by the Buffalo Fiscal Stability Authority ("BFSA"), which oversees the City's financial operations. Serving as an *ex officio* member of BFSA's Board of Directors, Mayor Brown voiced no objection to BURA's proposed allocation of HOME funds in the BFSA proceedings. In his capacity as Mayor, in March 2009 he filed a request with the United States Department of Housing and Urban Development ("HUD") for the release of $1.6 million of HOME funds to support the Project.

In deposition, Mayor Brown testified that he and the City "were trying to move this project forward" during this period, and "had every intention of supporting this project." App'x 1055. He further acknowledged that, based on communications such as the Wanamaker letter and actions such as the City's request to HUD for the release of funds, NRP's development team "could definitely feel that they were receiving support from the city," and "that it made sense for them to do everything that they were supposed to do to try to complete [the] project." *Id.* at 1059–60.

NRP did precisely that. It secured over $3 million in tax credits and low-interest loans from New York State and completed various other Project-related tasks: it conducted appraisals and title searches for the proposed lots, prepared architectural

7

designs, took out private loans, obtained insurance coverage, and submitted applications for requisite permissions to various governmental bodies with jurisdiction over the Project, such as the City Planning Board and the City's Department of Economic Development, Permit and Inspection Services. During this planning phase, NRP spent more than $489,000 on unreimbursed Project-related expenses and uncompensated labor devoted to Project-related tasks.

By mid-2009, almost all the preliminary arrangements were in place. NRP was prepared to begin construction as soon as Mayor Brown signed off on certain final matters. Critically, the City's legislature—the Common Council—had not yet approved the property transfer or the PILOT agreement because Mayor Brown had not yet introduced the necessary resolutions for the Council's action.

As it turned out, he never would. As a result, the Project never received the City's final approval. NRP never broke ground, and East Side II was never built.

To encounter such an impasse so late in the development process was apparently a rarity. Mayor Brown could not identify any other instance when an affordable housing project failed to proceed after BURA approved the needed allocation of HOME funds. As described above, he further testified that as late as March 2009, he and the City "had every intention of moving . . . forward" with East Side II. App'x 1828. Defendants have not offered any substantial explanation for the Mayor's reversal.

D.     The City's request to include the Jeremiah Partnership in East Side II

NRP proffers this explanation: it asserts that Brown blocked East Side II in retaliation for NRP's refusal to comply with the Mayor's demand, Appellants' Br. 2, namely, that NRP create a paid contractor role for a not-for-profit coalition of faith-based organizations based in Buffalo's East Side, referred to locally as the Buffalo

8

Jeremiah Partnership for Community Development (the "Jeremiah Partnership"). That organization was led by the Reverend Richard A. Stenhouse, whom NRP characterizes as a "key opinion[ ]maker" in Buffalo and Brown's "political ally." Appellants' Br. 10. Not surprisingly, the facts relevant to NRP's assertion are disputed by the parties. Because this appeal arises out of defendants' successful motions for summary judgment, we resolve all ambiguities and draw all reasonable inferences from the record in NRP's favor. *See Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015).

### 1. The City's request that NRP hire the Jeremiah Partnership

According to sworn statements made by defendant Casey (then Buffalo's deputy mayor), and Steven Weiss (NRP's outside counsel during the planning phase of East Side II), Mayor Brown stated on multiple occasions in late 2008 and early 2009 that the Project would move forward only if NRP provided a prominent paid role for the Jeremiah Partnership.[4] The Mayor expressed frustration, Casey and Weiss averred, that large development projects like East Side II were often orchestrated by "out of town white developers," and said he wanted Reverend Stenhouse to be involved "as the face of [this] Project in the Black community." App'x 2151.

---

[4] NRP relied on Casey's and Weiss's sworn statements rather than deposition testimony because Defendants moved for summary judgment before the close of discovery, when NRP had not yet deposed Casey and various other witnesses whom it had slated for examination. *See* Dist. Ct. Dkt. 154-1 at 9–10 (declaration in support of NRP's motion to strike or defer resolution of defendants' summary judgment motions until completion of discovery). The District Court concluded, however, that NRP had presented no legal basis for deferring adjudication of defendants' motions. Dist. Ct. Dkt. 175 at 3-4 (Decision and Order filed Nov. 17, 2016). The court's order denying deferral noted, too, the individual defendants' assertion of qualified and legislative immunity as defenses against NRP's federal claims and, in acting before the close of discovery, cited this Circuit's directive that "questions of immunity should be resolved 'at the earliest possible stage of the litigation.'" *Id.* at 3 (alteration omitted) (quoting *Drimal v. Tai*, 786 F.3d 219, 225 (2d Cir. 2015)).

Several contemporaneous emails and letters corroborate these accounts. On March 12, 2009, for example, a BURA official emailed NRP seeking a signed agreement with NRP for the purposes, among other things, of meeting certain goals for local hiring and for inclusion of minority- and women-owned business enterprises ("MWBEs"), and of "[w]ork[ing] with the . . . Jeremiah Partnership on this project." App'x 1986. The BURA official wrote that she had met with Stenhouse and "worked out" an agreement under which the Jeremiah Partnership would "assist in recruiting local minority sub-contractors," and NRP would permit Jeremiah-affiliated individuals to "shadow" NRP staff throughout the Project so that those individuals could gain experience in contracting and development. *Id*.

In a March 30, 2009 email to members of NRP's development team, NRP Vice President Aaron Pechota complained that he had "just [been] put on the spot" when a City official reiterated to him the City's request that NRP secure a "service contract" under which the Jeremiah Partnership would "help" NRP meet its goals for contracting with MWBEs (as requested by the City) and for employing low-income individuals (as required by federal law for projects financed by HOME funds, *see* 12 U.S.C. §§ 1701u, *et seq.*). App'x 2000. Pechota noted that he was "waiting to hear how much [Jeremiah] want[s]" for those services, but explained to his colleagues that the City "want[s] an answer asap (next 1.5 hours) if we are going to get our land approved [by the Common Council] tomorrow." *Id*.

Only one hour later, Stenhouse emailed NRP and City officials, proposing in a five-line email that Jeremiah "provide mwbe and [low-income] subcontractors for the fifty houses" to NRP in exchange for $30,000 and a year's worth of "management training" for Jeremiah members. App'x 1984. Shortly thereafter on March 30, after meeting, NRP emailed a counter-proposal, which it fleshed out the following day. NRP

10

withdrew that offer, however, in a letter dated April 8, 2009, explaining that, "[t]o avoid even the appearance of any impropriety," NRP had opted for "an open and public process to engage a local organization" for assistance with its hiring goals. App'x 1696. When Weiss notified Mayor Brown of NRP's decision to proceed with competitive bidding, Brown replied (as Weiss averred) "that he didn't care what [NRP] did so long as [it] hired 'the right company.'" App'x 2170.

On April 15—before NRP released its request for proposals for Project subcontractors (the "RFP")—a Jeremiah representative emailed Pechota a proposed service agreement, advising that "Reverend Stenhouse is ready to place his call to the Mayor endorsing our approach, provided I can show him an executed agreement with your firm." App'x 2004. Two weeks later, the City's Commissioner of Economic Development told Mayor Brown and Deputy Mayor Casey that he'd met with Weiss, who "said [NRP] knows what to do" and "will do it." App'x 2008. The Commissioner wrote further, "Rev. Stenhouse will call [the] Mayor should that contract be signed this AM. IF that happens, presumably the file could be introduced for passage today [before the Common Council]." *Id*. When a City official promptly followed up, however, Pechota responded that NRP "cannot execute any documentation prior to undertaking the RFP process." App'x 2010.

### 2. *NRP's competitive bidding process*

In late April 2009, NRP released its RFP for outreach services. It received responsive proposals from, among others, the Jeremiah Partnership, and the University at Buffalo's Center for Urban Studies (the "University Center"). As compared to Jeremiah's three-page offering, the University Center's twelve-page proposal provided substantial detail when describing the Center's past successes and its proposed work plan for East Side II. Moreover, Jeremiah's bid of $80,000—which included an opaque

11

lump-sum "administrative" fee of $35,000—was nearly double the University Center's bid of $40,524 for what to all appearances was a substantially similar set of services.

In a letter dated May 12 of that year, NRP notified the City that it had selected the University Center for the job, explaining that the Center's proposal "ranked far superior to the others." App'x 2094. Weiss shared this news with Mayor Brown in a conversation. As Weiss remembered it, the Mayor responded, "I told you what you had to do and you hired the wrong company." App'x 2171.

### 3. *Mayor Brown's professed reasons for declining to approve East Side II*

According to Deputy Mayor Casey, Mayor Brown's attitude toward East Side II "pivoted" after NRP selected the University Center over the Jeremiah Partnership. App'x 2152. For the first time, Brown began expressing concerns about two features of the Project: first, that the housing units would be built on scattered sites rather than in one consolidated area; and second, that the units would be made available on a 30-year rent-to-own basis rather than on other terms. Those two features had been part of East Side II's design from the very beginning, however, as confirmed by the February 2008 Wanamaker letter. The City itself identified the specific lots to be included in the Project, and later approved at least one other housing project that was similarly built on scattered sites. Meanwhile, Wanamaker had declared in his February 2008 letter that the City supported the lease-to-own financial structure because it would "provide[] future homeownership opportunities to residents who are not currently prepared to become homeowners, while providing them with clean, state-of-the-art housing today." App'x 409.

Meanwhile, June passed with no action by the Mayor. In a letter dated July 10, 2009, NRP protested to Mayor Brown that "[t]he only reason the Project has not and will not move forward is the inaction of your office," including Brown's failure to

12

"forward[] necessary resolutions to the Buffalo Common Council." App'x 2119. In NRP's view, the City had "repeatedly communicated . . . that the real reason for the inaction" was NRP's decision not to "contract with the Jeremiah Partnership as a consultant." *Id.*

## II. Procedural history

NRP filed suit in June 2011, asserting claims under federal and New York State law against the City, BURA, and the individual defendants.[5] From 2012 through 2017, the District Court issued a series of orders that collectively resolved all claims in defendants' favor. *See NRP Holdings LLC v. City of Buffalo*, No. 11-CV-472S, 2012 WL 2873899, 2012 U.S. Dist. LEXIS 97027 (W.D.N.Y. July 12, 2012) (granting in part a motion to dismiss by the City and the individual defendants); *NRP Holdings LLC v. Buffalo Urban Renewal Agency*, No. 11-CV-472S, 2013 WL 5276540, 2013 U.S. Dist. LEXIS 132602 (W.D.N.Y. Sept. 17, 2013) (granting in part BURA's motion to dismiss); *NRP Holdings LLC v. City of Buffalo*, No. 11-CV-472S, 2015 WL 9463199, 2015 U.S. Dist. LEXIS 172153 (W.D.N.Y. Dec. 28, 2015) (granting in part defendants' motions for judgment on the pleadings); *NRP Holdings LLC v. City of Buffalo*, No. 11-CV-472S, 2017 WL 745860, 2017 U.S. Dist. LEXIS 27064 (W.D.N.Y. Feb. 27, 2017) (granting defendants' motions for summary judgment).

NRP timely appealed the resulting judgment entered for defendants, challenging the District Court's resolution of the following four sets of claims:

(1) A civil RICO claim asserted against the individual defendants (resolved by summary judgment);

---

[5] NRP also named Reverend Stenhouse and the Jeremiah Partnership as defendants in its original complaint. In 2012, however, NRP voluntarily dismissed all claims against them with prejudice.

13

(2) A violation of the Equal Protection Clause, asserted via section 1983 against the City, BURA, and the individual defendants (dismissed under Rule 12(b)(6));

(3) A claim for breach of contract asserted against the City and BURA (dismissed under Rule 12(b)(6)); and

(4) A claim for promissory estoppel asserted against the City, BURA, and the individual defendants (dismissed in part under Rule 12(c), and later resolved by summary judgment).[6]

## DISCUSSION

We review de novo dismissals under Rules 12(b)(6) and 12(c), asking whether the allegations in the complaint, taken as true, state a plausible claim for relief. *Willey*, 801 F.3d at 61-62. We also review de novo an order granting summary judgment under Rule 56, construing all record evidence in the light most favorable to the non-moving party. *Id.* at 62. We will affirm a summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

NRP's allegations and evidence raise troubling questions about defendants' conduct regarding the East Side II development, particularly insofar as it can reasonably be inferred that the City would have approved the Project had NRP only agreed to pay the Mayor's ally for services in an amount that might be subject to question. For the

---

[6] In addition to the claims listed in the text above, NRP asserted claims against the City, BURA, and the individual defendants for due process violations, tortious interference with contract, and tortious interference with prospective economic advantage. The District Court dismissed these claims under Rules 12(b)(6) and 12(c). Although NRP's notice of appeal purports to appeal the District Court's disposition of *all* of NRP's causes of action against the City, BURA, and the individual defendants, NRP's appellate briefs make no mention of due process violations or tortious interference. We thus treat these claims as abandoned. *See Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany*, 615 F.3d 97, 103 n.9 (2d Cir. 2010).

reasons set forth below, however, we are nonetheless constrained to affirm the District Court's judgment on all claims. We conclude first that NRP's civil RICO claim is barred by the common-law doctrine of legislative immunity. Second, as to its claim for a "class of one" equal protection violation, NRP's complaint fails because it does not sufficiently allege the existence of similarly situated comparators. Next, NRP does not state a viable claim for breach of contract because NRP has failed to show that either the City or BURA entered into a binding preliminary agreement under municipal contracting rules that obligated the parties to continue negotiating in good faith. Finally, NRP fails to state a claim for promissory estoppel under New York law because it has not shown that defendants' conduct worked a "manifest injustice"—a stringent standard that is only rarely met by a plaintiff desiring to pursue a promissory estoppel claim against a municipal entity in New York.

## I.      Civil RICO

NRP asserts a civil RICO claim under 18 U.S.C. § 1964 against the individual defendants, each in his individual capacity.[7] It characterizes these defendants as conspiring to extort concessions from NRP (and from other unnamed developers working on other affordable housing projects), in violation of 18 U.S.C. § 1962(c) and (d).[8] To succeed on this claim, however, as we explain below, NRP must adduce facts concerning Mayor Brown's failure to introduce certain Project-related resolutions before

[7] Section 1964 provides a private right of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter," referring to title 18, chapter 96, "Racketeer influenced and corrupt organizations."

[8] As relevant here, section 1962(c) makes it unlawful "for any person . . . associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." Section 1962(d) makes it unlawful to conspire to do (among other acts) what section 1962(c) prohibits.

the City's Common Council—ultimately the action, or perhaps better termed the inaction, that ended the East Side II Project. Because we conclude that his failure to introduce the necessary resolutions amounted to protected legislative conduct, we agree with the District Court that NRP's civil RICO claim is barred by the common-law doctrine of legislative immunity. Accordingly, we affirm the court's award of summary judgment to the individual defendants on NRP's civil RICO claim.

A.    Legislative immunity for state and local officials

Under the Speech or Debate Clause of the federal Constitution, members of the United States Congress enjoy absolute immunity from civil and criminal liability for conduct that falls "within the sphere of legitimate legislative activity." *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 503 (1975) (discussing U.S. Const. art. I, § 6, cl. 1).[9] The Supreme Court has determined that, under the common law, state and local government officials similarly enjoy absolute immunity against federal civil claims asserted against them in their individual capacities for equivalent legislative activity. *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998). "Regardless of the level of government," the *Bogan* Court explained, "the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability."[10] *Id*. at 52.

---

[9] The clause provides in relevant part:

> The Senators and Representatives . . . shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

U.S. Const. art. I, § 6, cl. 1.

[10] The Supreme Court observed in *Bogan* at the same time that "certain deterrents to legislative abuse may be greater at the local level than at other levels of government." *Bogan*, 523 U.S. at 53.

The related common-law immunity that the Court has recognized attaches to particular types of *conduct*, not to particular *job titles*. *See Gravel v. United States*, 408 U.S. 606, 624–25 (1972). Thus, "officials outside the legislative branch" may be entitled to legislative immunity when "they perform legislative functions." *Bogan*, 523 U.S. at 55 (mayor performed "formally legislative" activities when introducing a budget resolution and signing an ordinance); *see also Sup. Ct. of Va. v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 731 (1980) (state supreme court acted legislatively when it issued attorney code of conduct). Analysis of the function at issue is therefore critical to a determination of whether legislative immunity will shield a defendant.

As discussed in greater detail below, a defendant may be entitled to invoke legislative immunity when the plaintiff's prima facie case depends on an inquiry into the defendant's legislative activity. *United States v. Brewster*, 408 U.S. 501, 512 (1972). A comprehensive immunity analysis thus would require a court to determine each individual defendant's potential entitlement to legislative immunity by considering whether NRP's civil RICO claim targets legislative conduct engaged in by *that defendant*. Here, that would call for scrutiny of NRP's civil RICO claim with respect to each

---

Unlike the states and the federal government, it observed, municipal entities "can be held [directly] liable for constitutional violations . . . . And, of course, the ultimate check on legislative abuse—the electoral process—applies with equal force at the local level, where legislators are often more closely responsible to the electorate." *Id*. We note, in addition, that federal common-law legislative immunity protects state and local officials only against federal civil law claims; it does not preclude federal or state criminal prosecutions or the pursuit of state-law causes of action for damages. *United States v. Gillock*, 445 U.S. 360, 373 (1980); *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 405 (1979). And significantly, unlike the constitutional immunity enjoyed by federal legislators, common-law immunity may be abrogated by statute. *See, e.g.*, *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951) (concluding that Congress intended no such abrogation with respect to liability under section 1983 for state legislators). But we need not decide here whether the federal civil RICO statute abrogates common-law immunity: NRP has made no argument to that effect.

17

defendant. Neither the District Court nor the parties performed that type of individualized assessment here, however. Instead, they focused solely on the question whether Mayor Brown performed a legislative function when he declined to introduce those anticipated resolutions before the Common Council that would have approved a sale of City-owned property to NRP and a PILOT agreement. In the sections that follow, we adopt the parties' general approach and address each element of the legislative immunity defense, asking, first, whether Brown's conduct was legislative in nature and, if so, whether NRP must adduce facts concerning that conduct to state a valid civil RICO claim against one or more of the individual defendants.

B.      Characterizing Brown's conduct as "legislative" or "administrative"

As we have observed, the Supreme Court directed courts to accord absolute legislative immunity to "all actions taken in the sphere of legitimate legislative activity." *Bogan*, 523 U.S. at 54 (internal quotation marks omitted). In doing so, it stressed that "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id*.

Drawing on *Bogan*, our Court has defined a two-part inquiry for determining whether an act is legislative:

> First, it is relevant whether the defendants' actions were legislative in *form*, *i.e.*, whether they were integral steps in the legislative process. Second, it may also be relevant whether defendants' actions were legislative in *substance*, *i.e.*, whether the actions bore all the hallmarks of traditional legislation, including whether they reflected discretionary, policymaking decisions implicating the budgetary priorities of the government and the services the government provides to its constituents.

*State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 89 (2d Cir. 2007) (first emphasis added) (internal quotation marks, citations, and alterations omitted). When

18

"high-level *executive* branch officials" like Mayor Brown seek to "claim the protections of an immunity traditionally accorded to members of the *legislative* branch," they must "show that their activities were 'legislative' both in form *and* in substance." *Id*. (final emphasis added).

We conclude that Mayor Brown's discretionary conduct in declining to introduce the necessary resolutions before the Common Council satisfies both elements of the *Rowland* test, and therefore constitutes protected legislative activity. Our reasons are as follows.

As an initial matter, Brown's actions (or specific inaction, here) seem to us without doubt legislative in *form*. Introducing a measure for a vote by a legislative body amounts to an "integral step[] in the legislative process," and is therefore a "formally legislative" act, even when performed by an executive official. *Bogan*, 523 U.S. at 55; *see also Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880) (legislative immunity protects "resolutions offered"). If introducing a resolution is a legislative act, then, precedent suggests, so must be refusal to introduce a resolution. *See Sup. Ct. of Va.*, 446 U.S. at 731–34 (concluding that Virginia Supreme Court acted legislatively both when it promulgated attorney code of conduct and when it declined to amend code of conduct); *see also Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1063 (11th Cir. 1992) (explaining that legislative immunity "protect[s] the democratic integrity of the legislative process" by preventing individuals from suing legislators "to ensure that a certain piece of legislation is brought before [a legislative] body for a vote"). The "exercise of legislative discretion" that legislative immunity is meant to protect, *Bogan*, 523 U.S. at 52, surely implies a genuine choice whether or not to perform a given legislative act.

We turn, therefore, to the second element of the *Rowland* test, which asks whether Brown's conduct was legislative in *substance*. On this point, we lack the benefit

of any precedential cases presenting similar facts. Since *Bogan*, our discussions of legislative immunity for state and local officials in precedential opinions have arisen primarily from disputes concerning individuals in public employment, not real estate or large-scale public projects.[11] Those employment cases established the following principles, instructive here: "The elimination of a *position* . . . is a substantively legislative act . . . . By contrast, a personnel decision is administrative in nature if it is directed at a particular *employee* . . . and is not part of a broader legislative policy." *Rowland*, 494 F.3d at 91 (emphases added) (internal quotation marks, citations, and alterations omitted). [12]

Reasoning from those cases, NRP argues that "[i]n the land development context, refusal to process a proposed development plan and/or issue a needed permit is administrative in nature, and thus not protected by legislative immunity." Appellants' Br. 36. In support, it cites *Anderson Group, LLC v. City of Saratoga Springs*, 557 F. Supp. 2d 332 (N.D.N.Y. 2008), in which the district court concluded that legislative immunity protected members of the Saratoga Springs City Council who voted to rezone a district, but not members of the City Planning Board who—allegedly in bad faith—delayed adjudicating a particular application for a special use permit. *Id.* at 345. The Planning

---

[11] *See Rowland*, 494 F.3d at 91-92; *Almonte v. City of Long Beach*, 478 F.3d 100, 108 (2d Cir. 2007); *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210–11 (2d Cir. 2003); *Camacho v. Brandon*, 317 F.3d 153, 164-65 (2d Cir. 2003); *see also Jessen v. Town of Eastchester*, 114 F.3d 7, 8–9 (2d Cir. 1997) (per curiam) (pre-*Bogan* decision assessing immunity for state legislators in connection with a public-employment dispute).

[12] We recognize that the categories of "legislative" and "administrative" acts, while mutually exclusive, are not necessarily exhaustive of the conduct of officialdom: the Supreme Court has also defined legislative activity by way of comparison to, for example, "political" activity, *Brewster*, 408 U.S. at 512, and "enforcement" actions, *Sup. Ct. of Va.*, 446 U.S. at 735–36. We focus here on *Rowland*'s legislative/administrative distinction because this analytical framework appears best-suited to the facts at hand, and because it occupied a central role in both the District Court's analysis and the briefing on appeal.

Board defendants appealed and, in a non-precedential order, this Court affirmed the denial of legislative immunity to those defendants on the grounds that the action taken with regard to the special use permit application was "administrative in nature." *Anderson Grp., LLC v. Lenz*, 336 F. App'x 21, 23 (2d Cir. 2009) (summary order). NRP argues that Mayor Brown's "conduct was [similarly] administrative in nature because . . . it was directed [at] a single developer on a single project and was not part of a broader legislative policy." Appellants' Br. 35.

Although the argument has some force, it fails to persuade us. Even if the *Anderson* rulings were binding here (and they are not), their factual setting is quite unlike that presented by NRP, and their conclusions would not affect our result. In this case, NRP did not merely apply to a planning board seeking, pursuant to well-established zoning rules, a permit to build homes on its own land using its own money. Rather, East Side II was conceived as a joint public-private venture through which the City would expand affordable housing options for its residents by contributing substantial municipal resources. Had the Project proceeded, these contributions would have taken the form of (as listed *supra* Background Section I.A) a PILOT tax incentive, the transfer of City-owned property, and the allocation of $1.6 million in BURA-administered HOME funds. Mayor Brown, the City's chief executive, faced the decision whether to seek Common Council approval for certain aspects of the Project. Those aspects affected municipal resources in their own right and carried additional significance when viewed in context: approval of those features was needed before NRP could secure financing and begin construction. Unlike the zoning board in *Anderson*, Brown was not deciding simply whether to seek the Common Council's blessing for a private development project; he was deciding whether a multimillion-dollar housing project, which would use extensive City resources, should proceed at all.

21

Upon review of these circumstances, we agree with the District Court that Mayor Brown's decision not to introduce the resolutions for Common Council action amounted to a "discretionary, policymaking decision[]" that implicated the City's "budgetary priorities . . . and the services [it] provides to its constituents." *NRP Holdings*, 2017 WL 745860, at *8, 2017 U.S. Dist. LEXIS 27064, at *24 (quoting *Rowland*, 494 F.3d at 89). We decide, therefore, that Mayor Brown's conduct in failing to present the resolution for Common Council action was legislative in substance, as well as in form, and thus constitutes protected legislative conduct for purposes of our analysis of common-law legislative immunity.

NRP argues that Brown's conduct is nonetheless not entitled to legislative immunity because his alleged pay-to-play scheme removes his actions from the "sphere of *legitimate* legislative activity." *Rowland*, 494 F.3d at 89 (quoting *Bogan*, 523 U.S. at 54) (emphasis added). This argument fails, however, because it conflates Brown's legislative conduct—his inaction before the Common Council—with other possibly illicit and unprotected acts in his alleged scheme—that is, his purported demands that NRP hire Stenhouse for what NRP describes as substantially a no-show role. The term "legitimate," as we and the Supreme Court have used it in this context, serves no function other than to emphasize that legislative immunity attaches only when a given act is validly classified as legislative. *See Tenney v. Brandhove*, 341 U.S. 367, 377 (1951) ("The claim of an unworthy purpose does not destroy the privilege.").

C.  Identifying the relevant conduct for civil RICO purposes

Having concluded that by declining to submit the resolutions for approval, Mayor Brown engaged in protected legislative conduct, we next consider whether that conduct is an essential component of NRP's civil RICO claim. We conclude that NRP's theory of RICO liability against all three individual defendants depends, in part, on a

showing that Brown's legislative decision not to introduce Common Council resolutions was fatally tainted by improper motive.[13] The Mayor could have declined to introduce the resolutions for either legitimate or illegitimate reasons; either way, this decision is protected by legislative immunity. We therefore affirm the District Court's conclusion that legislative immunity bars NRP's civil RICO claim against the individual defendants.

1.      The defense of legislative immunity is available against only those claims that would require a factfinder to consider evidence of an official's legislative actions. The Supreme Court defined the contours of this test in a pair of decisions arising out of federal corruption prosecutions: *United States v. Johnson*, 383 U.S. 169 (1966), and *United States v. Brewster*, 408 U.S. 501 (1972). Before discussing these cases, we pause to explain why, in a civil appeal concerning common-law legislative immunity asserted by city officials, we see fit to rely on criminal cases that addressed constitutional legislative immunity asserted by federal officials in defending criminal prosecutions.

The District Court appeared to disclaim reliance on any legislative immunity cases arising out of criminal proceedings, explaining that, unlike constitutional legislative immunity, common-law legislative immunity does not protect against federal criminal prosecutions. The District Court is correct that constitutional immunity protects against a broader set of claims than does the common-law doctrine. *See United States v. Gillock*, 445 U.S. 360, 373 (1980); *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 405 (1979). That difference in scope aside, however, courts have

---

[13] As noted above in Discussion Section I.A, courts should generally consider the defense of legislative immunity on a defendant-by-defendant basis. We nonetheless affirm the District Court's aggregated immunity analysis in this instance based on the record and the arguments presented to us in this appeal.

generally construed the two doctrines to be closely parallel in application. *See Sup. Ct. of Va.*, 446 U.S. at 733 ("[W]e generally have equated the legislative immunity to which state legislators are entitled . . . to that accorded Congressmen under the Constitution."); *Star Distributors, Ltd. v. Marino*, 613 F.2d 4, 8 (2d Cir. 1980) ("The shared origins and justifications of these two doctrines would render it inappropriate for us to differentiate the scope of the two without good reason."); *Schmidt v. Contra Costa Cty.*, 693 F.3d 1122, 1132 (9th Cir. 2012) (characterizing "common-law immunity against civil suits" as "parallel to the immunity provided by the Speech or Debate Clause").

Here, neither the District Court nor the parties have offered any basis for presuming that the civil or criminal nature of a case would influence a court's determination that a defendant's conduct constitutes (or does not constitute) protected legislative activity, or that the conduct is (or is not) integral to the opposing side's prima facie case. We thus see no reason not to look for guidance to Supreme Court precedent arising out of criminal, as well as civil, proceedings, as have our sister circuits in other civil appeals. *See, e.g.*, *Youngblood v. DeWeese*, 352 F.3d 836, 840 (3d Cir. 2004) (in civil case, citing criminal decisions that address definition of "legislative" activity); *Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Ill., Inc.*, 729 F.2d 1128, 1131 (7th Cir. 1984) (in civil case, citing criminal decisions that discuss "prima facie" standard). Because these criminal cases may provide useful insight, then, we now turn to a closer discussion of *Johnson* and *Brewster*.

In 1966, in *Johnson*, the Court affirmed the Fourth Circuit's decision setting aside a federal representative's criminal conspiracy convictions on legislative immunity grounds. The charged offense conduct at issue on appeal consisted primarily of accepting bribes in exchange for making a speech in the House of Representatives; the prosecution's conspiracy theory "depended upon a showing that the speech was made

24

solely or primarily to serve private interests." 383 U.S. at 177. In other words, the prosecution asked the jury to consider both the "motives underlying the making of the speech" and the speech's "contents" to convict. *Id*. at 184. Finding that the act of delivering the speech in the House was quintessentially legislative activity, the Court declined to consider the asserted motivations for the act, and concluded that the representative was entitled to constitutional legislative immunity.[14]

In contrast, in *Brewster*, the Court determined that a former U.S. Senator was not entitled to legislative immunity. The former legislator was charged under a statute that the Court characterized as criminalizing "accepting a bribe in exchange for a promise relating to an official act." 408 U.S. at 502 (describing 18 U.S.C. § 201(c)(1), (g)). Critically, in *Brewster* the government bore no obligation to show that the defendant former Senator "*fulfilled* the alleged illegal bargain" because the statutory violation was complete upon accepting something of value in exchange for a *promise*. *Id*. at 526 (emphasis added). As the Court observed, "Taking a bribe is, obviously, . . . not a legislative act." *Id*. Thus, the defendant was not entitled to legislative immunity: unlike in *Johnson*, "no inquiry into legislative acts or motivation for legislative acts [was] necessary for the [prosecution] to make out a prima facie case." *Id*. at 525. All that was needed was the threshold determination that the act for which he was prosecuted— accepting a bribe—was not legislative.

2.    Applying this framework to the case at hand, we begin by identifying the required elements of NRP's civil RICO claim against the three individual defendants. We next consider whether NRP, as plaintiff, can satisfy those elements without

---

[14] The Court noted that the representative's "speech . . . was only a part of the conspiracy charge" lodged under 18 U.S.C. § 371. *Johnson*, 383 U.S. at 185. It left open the possibility of a retrial "wholly purged of elements offensive to the Speech or Debate Clause." *Id.*

considering the fact of, or motives for, Mayor Brown's refusal to seek Common Council approval for the transfer of City-owned lots or the PILOT agreement. Because we determine that the circumstances of this case preclude NRP from doing so, we hold that the three individual defendants are shielded by legislative immunity.

To state a civil RICO claim, NRP must show, first, that the individual defendants committed a substantive RICO violation, and second, that the violation proximately caused an injury to NRP's business or property. *See* 18 U.S.C. § 1964(c); *D'Addario v. D'Addario*, 901 F.3d 80, 96 (2d Cir. 2018). As to the second element, NRP asserts that it was directly injured by the individual defendants' demands that it provide the Jeremiah Partnership with an (overpriced) paid consulting role in East Side II. Attempting to draw an analogy to *Brewster*, NRP insists that "the extortion[ate] demand itself [gave] rise to fear of economic loss, regardless of whether . . . [the individual defendants] made good on this threat." Appellants' Reply Br. 21. This fear, they urge, was injury enough to sustain that claim.

NRP's theory falls short of the mark. NRP has cited no authority to support its assertion that mere *fear* of economic loss is sufficient to satisfy the required RICO element of a compensable injury to business or property. In our view, the only potentially cognizable injury to NRP in this matter consists of the $489,000 in expenditures that it incurred during the Project's preliminary planning phases. Those expenditures did not become losses, however, until the Project failed to move forward as planned. To show a proximately caused injury, NRP must demonstrate that East Side II failed to move forward *because of* a substantive RICO violation committed by the individual defendants. *D'Addario*, 901 F.3d at 96 (requiring RICO plaintiffs to show "some direct relation between the injury asserted and the injurious conduct alleged"); *see, e.g.*, *Chappell v. Robbins*, 73 F.3d 918, 921 (9th Cir. 1996) (concluding that a state

26

senator's "acceptance of bribes caused no injury" to plaintiff, a private citizen, until the senator "*acted* on those bribes and pushed legislation through" that harmed plaintiff's business (emphasis added)). This, they cannot do without reference to the Mayor's failure to introduce the required resolutions—the act that is legislative in substance and in form.

It is undisputed that the East Side Housing II development could not be realized without a transfer of City-owned property and execution of a PILOT agreement, and that both of these acts required the Common Council's approval. It is also undisputed that Mayor Brown retained sole discretion over whether to introduce the resolutions necessary to obtain that approval. Brown's decision not to introduce those resolutions thus constitutes a "necessary step in the causal chain linking the [individual] defendant[s'] alleged [misconduct] to [NRP's] injury." *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015). Whatever RICO violations the individual defendants may have committed during the Project's planning phase, NRP cannot show an injury *proximately caused* by those violations without inquiring into Brown's discretionary decision not to seek Common Council approval for the land transfer and the PILOT agreement. If Brown's decision was not itself a RICO violation, and if he was authorized to make the same decision irrespective of any prior racketeering activity, that decision would amount to an intervening cause sufficient to break the causal chain. *See id.*[15]

---

[15] In *Sergeants Benevolent Association*, we discussed the import of such intervening causes as follows in the context of an asserted RICO mail-fraud violation:

> Although reliance on the defendant's alleged misrepresentation is not an element of a RICO mail-fraud claim, the plaintiffs' theory of injury in most RICO mail-fraud cases will nevertheless depend on establishing that *someone . . .* relied on the defendant's misrepresentation. . . . [I]f the person who was allegedly

We determined above that Brown's inaction regarding the Common Council resolutions was protected legislative conduct. We now conclude that NRP is unable to "make out a prima facie case" on its RICO claim without reliance on that legislative conduct. *Brewster*, 408 U.S. at 525. NRP's civil RICO claim as against all three individual defendants is therefore barred by the legislative immunity that attaches to Brown's protected legislative conduct. *See, e.g.*, *Chappell*, 73 F.3d at 921-22 (affirming dismissal of civil RICO claim "because the conduct by which the [defendant senator's] bribe proximately caused [plaintiff's] injury was legislative, and therefore immune").

For these reasons, we affirm the District Court's grant of summary judgment on NRP's civil RICO claim to the three individual defendants.

## II.    Equal Protection

NRP also charges that the City, BURA, and the individual defendants violated NRP's rights, as a "class of one," under the Equal Protection Clause, thereby entitling it to damages under 42 U.S.C. § 1983. The District Court dismissed this claim under Rule 12(b)(6). We affirm the dismissal because NRP failed to sufficiently allege the existence of similarly situated comparators.[16]

---

> deceived by the misrepresentation . . . would have acted in the same way regardless of the misrepresentation, then the misrepresentation cannot be a but-for, much less proximate, cause of the plaintiffs' injury.

806 F.3d at 87 (emphasis added) (internal citations and footnote omitted).

[16] The District Court provided two grounds for its dismissal of NRP's class-of-one claim. First, the District Court suggested that NRP had likely failed to establish itself as similarly situated to other developers because NRP allegedly "was treated differently from other developers (*i.e.*, not hired for the project) *because it acted differently* (*i.e.*, refused to involve Stenhouse) than the other developers who allegedly complied with the City's demands.*" NRP Holdings LLC,* 2012 WL 2873899, at *16, 2012 U.S. Dist. LEXIS 97027, at *47 (emphasis in original). Second, the court

Although "[t]he Equal Protection Clause has traditionally been applied to governmental classifications that treat certain *groups* of citizens differently than others," the Supreme Court has also endorsed "a class-of-one theory for equal protection claims, under which a single individual can claim a violation of her Equal Protection rights based on arbitrary disparate treatment." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 221 (2d Cir. 2012) (emphasis added) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). To establish a "class of one" claim, a plaintiff must show that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Id.* at 222 (quoting *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 60 (2d Cir. 2010)).

NRP's second amended complaint alleges that, pursuant to an "official custom or policy established by Brown, Casey, and/or Smith,"

> NRP was treated differently than other developers of projects in the City of Buffalo. When other developers found

---

noted that in *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591 (2008), the Supreme Court held that "class of one" claims are not available "in the public employment context," *id.* at 594, and concluded that "this holding logically extends to the government-contractor relationship." *NRP Holdings*, 2012 WL 2873899, at *16, 2012 U.S. Dist. LEXIS 97027, at *48. We rely on neither of these grounds here. *See Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 413 (2d Cir. 2014) (appeals court may "affirm on any basis for which there is sufficient support in the record, including grounds not relied on by the district court"). In addition, we decline to consider NRP's newly asserted claim that Mayor Brown discriminated against NRP on the basis of racial animus. NRP failed to articulate this racially based "selective treatment" equal protection theory before the District Court, either in its operative complaint or in its opposition to defendants' motion to dismiss. NRP has therefore forfeited any such claim.

> a way to pay monies to Stenhouse and/or affiliated organizations, [defendants] allowed their projects to proceed to completion. Because NRP refused to make such payments, [defendants] . . . actively took steps to kill the Project. The difference in treatment was not on the basis of any legitimate government policy or the product of a mistake.

2d Am. Compl. ¶¶ 153, 156. This differential, NRP urges, entitles it to relief under section 1983.

To establish a class-of-one claim, a plaintiff must "show an extremely high degree of similarity between itself and its comparators." *Fortress Bible*, 694 F.3d at 222. NRP's complaint, however, provides insufficient detail about the "other developers" and the projects that were allegedly approved. Potentially relevant facts include whether those developers' projects concerned affordable housing or some other type of construction; whether they involved transfers of City-owned property; and whether they required public funding or tax exemptions.[17] Those silences are fatal to NRP's claim. *Compare Olech*, 528 U.S. at 565 (permitting a "class of one" claim where the plaintiff alleged that "the Village intentionally demanded a 33-foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15-foot easement from other similarly situated property owners"), *with Ruston*, 610 F.3d at 59–60 (affirming dismissal because, although plaintiffs "identif[ied] several properties that allegedly were allowed to connect to the Village's sewer

---

[17] NRP does allege, it is true, that "[t]he difference in treatment" among the development projects "was not on the basis of any legitimate government policy," 2d Am. Compl. ¶ 156, but was based on the Mayor's improper demands. But this conclusory allegation regarding the other projects does not cure the claim's deficiencies: a "formulaic recitation of the elements of a cause of action" will not protect a claim against dismissal absent additional factual support. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

system," including commercial facilities and single homes, none of those properties was sufficiently "similar to [plaintiffs'] proposed 14-home development").

For these reasons, we conclude that NRP's allegations fail to establish that any individual defendant violated NRP's Equal Protection rights.[18] We further conclude that NRP has failed to allege a valid equal protection claim against the City or BURA: because NRP's alleged injuries are solely attributable to the actions of named individual defendants, NRP's failure to allege a constitutional violation by the individual defendants necessarily forecloses a claim of municipal liability. *Matican v. City of New York*, 524 F.3d 151, 154 (2d Cir. 2008) (If the individual officials' actions did not "violate [plaintiff's] constitutional rights . . . , then the City cannot be liable to [plaintiff] under § 1983, regardless of whether the [officials] acted pursuant to a municipal policy or custom.").

For these reasons, we affirm the District Court's dismissal of NRP's class-of-one claim as against all defendants.

## III.    Breach of Contract

NRP asserts a claim for breach of contract against the City and BURA. In its second amended complaint, NRP alleges that Wanamaker's February 25, 2008 letter established a "preliminary agreement obligating [the City] and/or BURA to make good faith efforts to realize the specific commitments set forth in the agreement," and that defendants breached that agreement by "failing . . . to move the Project forward in good faith." 2d Am. Compl. ¶¶ 118, 121. The District Court dismissed this claim under Rule

---

[18] Because we conclude that NRP failed to sufficiently allege an Equal Protection violation by any defendant, we need not consider defendants' related arguments regarding abandonment, legislative immunity, or qualified immunity.

31

12(b)(6) on the grounds that the Wanamaker letter does not evince the parties' mutual intent to be bound to continued negotiations in good faith. We agree, and therefore affirm the dismissal.

To create a binding contract under New York law, the parties must provide a "manifestation of mutual assent sufficiently definite to assure that [they] are truly in agreement with respect to all material terms." *Stonehill Capital Mgmt., LLC v. Bank of the West*, 28 N.Y.3d 439, 448 (2016) (internal quotation marks and citations omitted). In determining whether mutual assent has been shown, courts "look to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Id*. (internal quotation marks and citations omitted). Even in situations where the parties have *not* manifested mutual assent as to all material terms, New York courts have held that "parties may enter into a binding contract under which the obligations of the parties are conditioned on the negotiation of *future* agreements."[19] *IDT Corp. v. Tyco Grp., S.A.R.L.*, 23 N.Y.3d 497, 502–03 (2014) (emphasis added). In New York, a preliminary agreement of that nature obligates the parties to continue "negotiat[ions] in good faith." *Id* at 503.

Beyond these common-law requirements, state and local statutes and ordinances may impose additional requirements on municipal contracting "to protect the public from corrupt or ill-considered actions [by] municipal officials." *Henry Modell & Co. v. City of New York*, 159 A.D.2d 354, 355 (1st Dep't 1990). "Municipal contracts which

---

[19] Although the nomenclature has not been uniformly adopted, our Court has sometimes referred to such agreements as "Type II" preliminary agreements. *See Brown v. Cara*, 420 F.3d 148, 157 (2d Cir. 2005) ("While a Type I preliminary agreement is fully binding as to the final contractual goal, a Type II agreement does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith." (internal quotation marks omitted)).

violate express statutory provisions are invalid," even if the purported contracts bear the hallmarks of mutual assent. *Granada Bldgs., Inc. v. City of Kingston*, 58 N.Y.2d 705, 708 (1982); *see also Casa Wales Hous. Dev. Fund Corp. v. City of New York*, 129 A.D.3d 451, 451 (1st Dep't 2015) (applicable "statutory" law includes municipal charters). Moreover, a party wishing to contract with a municipality "is chargeable with knowledge of the statutes which regulate its contracting powers and is bound by them." *Mans Const. Oversite, Ltd. v. City of Peekskill*, 114 A.D.3d 911, 912 (2d Dep't 2014) (citing *Parsa v. State*, 64 N.Y.2d 143, 147 (1984)).

Buffalo's City Charter provides that "[e]very contract to which the city is a party shall be made and executed in the name of the city and approved as to form by the corporation counsel, and signed and acknowledged by the head of the department charged with the execution of the matter therein provided for." City Charter § 22-1.[20] The Charter does not expressly direct that municipal contracts be in writing, but that expectation is unmistakably conveyed through the concurrent requirements that city contracts be "executed" and "signed" by certain officials. In determining whether the Wanamaker letter created a binding preliminary agreement among the parties, then, we search for evidence of mutual assent within the four corners of the letter itself and do not consider extrinsic evidence. *See Parsa*, 64 N.Y.2d at 147 ("Even though a promise to pay may be spelled out from the parties' conduct, a contract between them may not be implied to provide 'rough justice' and fasten liability on the [government] when applicable statutes expressly prohibit it.").

---

[20] The Charter is publicly available at https://ecode360.com/13550986 (last visited February 19, 2019). The Charter provisions relevant for this appeal were effective as of July 1, 2000, City Charter § 32-8, long before the events that led to this lawsuit.

Having conducted this review, we conclude that the Wanamaker letter did not create a binding preliminary agreement. We are unable to discern in the letter evidence of a shared commitment by the parties to continue negotiations with each other in good faith. The letter provides no evidence of the parties' *mutual* assent to be bound. Acting in his capacity as Executive Director of Buffalo's Office of Strategic Planning, Wanamaker signed the letter on behalf of BURA and the City. No member of NRP's development team executed or otherwise endorsed the letter. The letter contains no undertakings by NRP, and, as the District Court observed, the letter does not even contain a "signature line where NRP *could* have signed." *NRP Holdings*, 2012 WL 2873899, at *7, 2012 U.S. Dist. LEXIS 97027, at *22 (emphasis added).

In arguing that the Wanamaker letter bound them both, NRP relies primarily on *Brown v. Cara*, 420 F.3d 148 (2d Cir. 2005), and *Goodstein Construction Corp. v. City of New York*, 67 N.Y.2d 990 (1986), each of which held that the parties entered into an enforceable preliminary agreement. Those cases are easily distinguishable, however. In *Brown*, the parties' memorandum of understanding ("MOU") forthrightly stated and defined "the parties' agreement to 'work together to develop, build, market, and manage [the property]' and to 'work together in accordance with the terms and conditions outlined [in the MOU].'" 420 F.3d at 158 (alterations in original) (quoting the MOU). Similarly, in *Goodstein Construction*, the terms of the agreement committed the defendant city to "cooperate with [the] plaintiff in developing [certain documents] for eventual submission" to municipal entities. 67 N.Y.2d at 991. Here, by contrast, the Wanamaker letter says nothing about future negotiations or NRP's obligations. Rather, the letter articulates commitments by BURA and the City to *perform governmental acts* by allocating HOME funds, approving a PILOT agreement, and transferring City-owned lots. NRP does not seek to enforce those commitments, however; rather, NRP seeks to

34

enforce an unstated understanding that the parties would continue negotiating in good faith to bring the planned project to fruition.

NRP insists that Wanamaker's letter "memorialized the parties' prior agreements" and "must be read in the context of the parties' agreement to take the steps necessary to complete the Project." Appellants' Br. 65. It emphasizes Brown's statement in deposition that, based on the Wanamaker letter, NRP's team could "definitely feel that they were receiving support from the city," and "that it made sense for them to do everything that they were supposed to do to try to complete [the] project." App'x 1059–60. Because NRP's breach of contract claim failed on a motion to dismiss under Rule 12(b)(6), however, Brown's testimony is not properly before us with respect to this claim. In any event, that testimony would not alter our analysis. As the New York Court of Appeals has stated, "The mere expectation that a contract will be entered into does not constitute a contract." *Papa v. New York Tel. Co.*, 72 N.Y.2d 879, 881 (1988) (quoting 1 Williston, Contracts § 27, at 66 (3d ed. 1957)) (alterations omitted). The Buffalo Charter requires that municipal contracts be in writing. Thus, the putative contractual document must, on its face, evince the requisite meeting of the minds. Although the Wanamaker letter evinces the city's serious interest in the project, it does not embody mutual assent of any kind, never mind to any enforceable proposition.[21]

We conclude that the Wanamaker letter did not establish a binding agreement requiring the City or BURA to engage in continued negotiations with NRP, and so we affirm the District Court's dismissal of NRP's claim for breach of contract.

---

[21] It is true that New York recognizes unilateral contracts, under which one party makes a unilateral "offer to contract, which . . . becomes a binding obligation" if another party takes whatever actions are specified as conditions of acceptance. *I. & I. Holding Corp. v. Gainsburg*, 276 N.Y. 427, 433 (1938). NRP has not argued, however, that the Wanamaker letter constituted a unilateral offer to contract, and so we do not consider whether it would qualify as such.

## IV.     Promissory Estoppel

Finally, NRP asserts a claim for promissory estoppel against the City, BURA, and the individual defendants, seeking to hold them liable for NRP's reliance on the "commitments" articulated in the Wanamaker letter. The District Court dismissed the claim under Rule 12(c) as to some of those alleged promises, and later granted summary judgment to defendants as to the remaining promises.

We affirm the judgment in favor of defendants on this count. Under New York law, municipal defendants may not be subject to promissory estoppel claims except in rare cases of "manifest injustice," *N.Y. State Med. Transporters Ass'n, Inc. v. Perales*, 77 N.Y.2d 126, 130-31 (1990). This exception is not available to NRP on the facts of this case.[22]

To establish a claim of promissory estoppel, a plaintiff "must demonstrate that the [defendant] made a clear and unambiguous promise, upon which the [plaintiff] reasonably relied, to its detriment." *Wilson v. Dantas*, 29 N.Y.3d 1051, 1062 (2017). Even if a plaintiff can establish those elements, however, promissory estoppel is generally "not available against a governmental agency engaging in the exercise of its governmental functions."[23] *Advanced Refractory Techs., Inc. v. Power Auth. of State of N.Y.*, 81 N.Y.2d 670, 677 (1993) (internal quotation marks omitted); *see also Perales*, 77 N.Y.2d

---

[22] The District Court relied on other grounds in adjudicating defendants' various dispositive motions, but as noted above, we "may affirm on any basis for which there is sufficient support in the record." *Lotes*, 753 F.3d at 413. This rationale was available to defendants both on the face of the pleadings and at the summary judgment stage, and so it is immaterial for present purposes that the District Court resolved different components of NRP's claims at different phases of the case.

[23] NRP has not contested that defendants performed a "governmental function" when making decisions about whether to proceed with the East Side II project.

at 130–31 (articulating similar limit on equitable estoppel). In particular, if a putative agreement fails to satisfy municipal contracting requirements, courts will generally dismiss both "contractual and noncontractual . . . causes of actions, including . . . promissory estoppel." *Michael R. Gianatasio, PE, P.C. v. City of New York*, 159 A.D.3d 659, 660 (1st Dep't 2018); *accord Casa Wales*, 129 A.D.3d at 451 (affirming dismissal of claims for breach of contract and promissory estoppel because, "where there is a lack of authority on the part of agents of a municipal corporation to create a liability, except by compliance with well-established regulations, no liability can result unless the prescribed procedure is complied with and followed").

New York courts have carved out a narrow exception to this rule in cases where the government's "misleading nonfeasance would otherwise result in a manifest injustice." *Agress v. Clarkstown Cent. Sch. Dist.*, 69 A.D.3d 769, 771 (2d Dep't 2010). Thus, while "the possibility of estoppel against a governmental agency" is not "absolutely precluded," the doctrine is unavailable "in all but the rarest cases." *Perales*, 77 N.Y.2d at 130. "[T]hose who deal with the government are expected to know the law, and cannot rely on the conduct of government agents contrary to law as a basis for 'manifest injustice' claims." *Id.* at 131; *see also Granada*, 58 N.Y.2d at 708 ("[A] governmental subdivision cannot be held answerable [under estoppel] for the unauthorized acts of its agents.").

NRP seeks to hold defendants liable for the commitments articulated in the Wanamaker letter: namely, the City's stated intention to allocate $1.6 million in HOME funds, to approve the PILOT agreement, and to transfer City-owned property. We have already concluded that the Wanamaker letter did not create a binding contract; NRP's promissory estoppel claims based on the same document are therefore presumptively invalid absent a showing of "manifest injustice."

NRP contends with some force that the exception should apply here based on defendants' unsavory and "extortionate pay-to-play scheme." Appellants' Br. 57. The New York case law applying this exception strongly suggests, however, that the circumstances presented here do not meet the manifest injustice standard as those courts have understood it. New York appellate courts have permitted estoppel claims against municipal entities to proceed where individual persons relied to their detriment on a city's erroneous promises concerning, for example, their financial benefits as public employees,[24] or their obligation to file a timely notice of claim when suing the municipality.[25] We are not aware of any case, however, in which a sophisticated business entity was permitted to use a promissory estoppel theory to enforce an alleged agreement with a municipality that failed to comply with municipal contracting requirements. New York courts have denied estoppel to contractors who *fully performed* their extensive contractual duties and then were denied payment when the contract was found to be invalid. In a recent case, a New York Supreme Court decision acknowledged that New York City had "failed to pay [the plaintiff] more than $1.5 million for work done and money outlaid" under two construction contracts. *Michael R. Gianatasio, PE, P.C. v. City of New York*, 53 Misc. 3d 757, 771 (N.Y. Sup. 2016). The

---

[24] *See Vassenelli v. City of Syracuse*, 138 A.D.3d 1471, 1475 (4th Dep't 2016) ("Plaintiff alleged that, based on his reliance on the city defendants' payment for services and medications prior to August 2009, he failed to apply for Medicare Part B benefits when he became eligible to do so, thereby requiring the payment of significant penalties."); *Agress*, 69 A.D.3d at 771 (Plaintiff "made certain employment and insurance decisions based upon the [erroneous] representations that she was entitled to receive continuing health insurance coverage from the School District.").

[25] *Konner v. New York City Transit Auth.*, 143 A.D.3d 774, 775–77 (2d Dep't 2016) ("[A] municipal corporation may be equitably estopped from asserting lack of notice of claim when it has wrongfully or negligently engaged in conduct that misled or discouraged a party from serving a timely notice of claim or making a timely application for leave to serve a late notice of claim, and when that conduct was justifiably relied upon by that party." (citing *Bender v. N.Y. City Health & Hosps. Corp.*, 38 N.Y.2d 662, 668 (1976))).

Appellate Division nonetheless affirmed the trial court's dismissal of the plaintiff's claims for breach of contract and promissory estoppel, finding dispositive its conclusion that "the contract at issue never met the requirements of . . . the New York City Charter." *Michael R. Gianatasio*, 159 A.D.3d at 660; *see also Mans Const.*, 114 A.D.3d at 912 ("The mere acceptance of benefits does not estop the municipality from denying liability for payment for services rendered, where a contract was neither validly entered into nor ratified."). Here, NRP merely incurred costs while *preparing* to perform on an expected agreement. NRP has not pointed to any analogous case in which a New York court has applied promissory estoppel against a New York municipality, even after performance has occurred.

The New York Court of Appeals acknowledged long ago that results like these "may seem unjust." *Parsa*, 64 N.Y.2d at 147. It explained its decision hewing to the high standard of "manifest injustice" by reasoning that "any other rule would completely frustrate statutes designed to protect the public from governmental misconduct or improvidence." *Id.* To protect themselves, municipal contractors may "withhold [their] services unless an agreement is executed and approved as the statutes require." *Id*. They may not, however, invoke estoppel to salvage otherwise unenforceable agreements.

We conclude that NRP's claim of promissory estoppel as against all defendants cannot be sustained under prevailing principles of New York law. We therefore affirm the District Court's judgment in defendants' favor on this claim.

## CONCLUSION

NRP argues that a proposed 50-home affordable housing project in the City of Buffalo fell apart at the eleventh hour because City officials prioritized cronyism over civic responsibility. Those are serious allegations, and NRP has come forward with

substantial evidence of their accuracy. That evidence, however, is insufficient to overcome the significant legal flaws in NRP's claims for damages. Municipal officials are shielded against certain federal civil claims by the common-law doctrine of legislative immunity. Plaintiffs asserting equal protection "class of one" claims bear the burden of sufficiently alleging similarly situated comparators. Municipal entities may not be sued under New York law if the plaintiff detrimentally relied on promises by municipal officials but failed to secure a binding contract that complied with municipal law. NRP has failed to surmount these barriers. We therefore **AFFIRM** the judgment of the District Court.